GARFIELD AND PROCTOR COAL COMPANY *vs.* PENNSYLVANIA
COAL AND COKE COMPANY.

Norfolk.    March 24, 1908. — May 20, 1908.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, & SHELDON, JJ.

*Contract,* Construction, Performance and breach. *Evidence,* Extrinsic affecting writings, Admitted without objection, Admissions and confessions. *Waiver. Practice, Civil,* Rulings and instructions. *Agency,* Authority to make admissions. *Corporations. Damages.*

A contract in writing for the sale and delivery of coal began as follows: " We have this day sold you fifty thousand tons bituminous coal to be shipped as follows: twenty five hundred tons per month from September 1, 1902, until April 1, 1903, at price of $2.80 per gross ton . . ., balance of tonnage, about thirty two thousand five hundred tons, to be shipped in about equal proportions between April 1 and September 1, 1903, at the price of $2.60 per gross ton." A subsequent provision was as follows: " Should we fail to ship to you the full tonnage due to you from September 1, 1902, to April 1, 1903, in about equal monthly quotas, we authorize you to go into the open market and buy any balance unshipped, sending us bill for the difference in price, if any." *Held,* that by this agreement the seller was bound to ship at least twenty-five hundred tons of coal in each month from September 1, 1902, to April 1, 1903; that the words " in about equal monthly quotas " as used in the clause providing a mode for the assessment of damages could not control the express stipulation with which the contract opened, the clause being inserted, not for the purpose of defining the obligation of the seller as to shipments, but to provide a ready means of settling the damages in case of a breach of the contract, and that the utmost effect that could be given to the words " in about equal monthly quotas " would be to treat them as giving the seller liberty to ship somewhat more than twenty-five hundred tons in any particular month.

In an action for the alleged breach of a contract in writing for the sale and shipment of a certain amount of coal in each month during a period named, the correspondence and negotiations of the parties before the making of the contract may be competent, under the circumstances of the particular case, as an aid in construing the language in which the parties finally embodied their agreement, by enabling the court to understand the subject matter of the contract as it lay in the minds of the parties and thus to determine the meaning which they put upon any doubtful or ambiguous terms they may have used; but merely tentative offers made by either party while they were endeavoring to reach an agreement cannot control the plain meaning of their contract as finally concluded.

In an action for damages incurred by reason of the alleged failure of the defendant to deliver coal to the plaintiff at the times and in the amounts required by the terms of a contract in writing, under which the defendant was bound to ship to the plaintiff at least twenty-five hundred tons of coal "f. o. b. vessel" at a port named in each month during a period named, where it appeared that there was no storage for coal on the piers from which the coal was shipped, that a vessel arriving for coal anchored in the stream to await her turn to load, that

when she took her place at the piers the coal was dumped into her from the railroad cars which brought it from the mines, that when the vessel was loaded she left the piers, and the coal, then and not before, was billed by the defendant to the plaintiff, it was *held,* supporting the findings and rulings of an auditor as adopted by the trial judge, that the meaning of the contract was that the defendant should place twenty-five hundred tons of coal each month on vessels to be furnished by the plaintiff, so that the vessel or vessels during the month could sail for their destination with at least twenty-five hundred tons, that it was the duty of the plaintiff to furnish each month vessels capable of carrying the twenty-five hundred tons, and that a failure to do so would excuse the defendant, that, if the plaintiff in any month sent a vessel capable of carrying more than twenty-five hundred tons, the defendant's obligation for that month ceased upon its loading the twenty-five hundred tons into the vessel during the month, and, if the plaintiff saw fit to hold the vessel over for a full cargo, it could not show any breach of the defendant's contract for that month, but that the dates of the respective shipments were the dates when the vessels were loaded and ready to sail and were not the dates when portions of the coal were dumped into a vessel from time to time before she was loaded sufficiently to be ready to sail.

In an action for damages incurred by reason of the alleged failure of the defendant to deliver coal to the plaintiff at the times and in the amounts required by the terms of a contract in writing which contained a clause making the delivery of coal subject to causes beyond the defendant's control, if it appears that the defendant failed to make the deliveries at the times required by the contract but afterwards shipped substantially all the coal stipulated for and that the plaintiff received and paid for it without any reservation or claim for damages on account of delay, and made statements of satisfaction with the conduct of the defendant, this does not constitute, as matter of law, a waiver of the plaintiff's claim for damages for breach of contract if it also appears that the acts and statements of the plaintiff, relied on to show a waiver, were done and made when the plaintiff supposed that the defendant unavoidably had been prevented by a scarcity of coal from making its deliveries more promptly, and when the plaintiff was ignorant of the fact, afterward discovered by it, that during the period in which the defendant failed to make the deliveries of coal to the plaintiff called for by the contract it was making deliveries to other persons, which it was not under obligation to make, of coal more than sufficient in amount to comply with the requirements of the contract.

Where a seller has agreed to deliver goods in specified amounts at certain times, and fails to comply with the terms of his contract as to the times at which the specified amounts shall be delivered, but ultimately delivers all the goods stipulated for by the contract, the buyer by taking what he can get under the contract when he can get it does not necessarily, as matter of law, waive his claim for damages for a failure to make the deliveries at the agreed times and in the agreed quantities.

The proprietor of a coal mine agreed in writing with a coal merchant to ship to him at a price named twenty-five hundred tons of coal in each month from September 1, 1902, until April 1, 1903. The contract contained the following provision: "Should we fail to ship you the full tonnage due you from September 1, 1902, to April 1, 1903, in about equal monthly quotas, we authorize you to go out into the open market and buy any balance unshipped, sending us the bill for the difference in price, if any." *Held,* that the provision quoted was inserted for the benefit of the buyer and gave him a privilege to be exercised at his option, and was not provided as the exclusive means for ascertaining or liquidating

the buyer's damages in case of a failure of the seller to ship the required amount of coal in each month during the period named, so that, in case of such a breach of the contract by the seller, the buyer did not waive his claim for damages by failing to buy coal to fill the deficiencies and sending bills to the seller for the difference in price.

In an action by a coal dealer against the owner of mines of bituminous coal for the alleged breach of a contract in writing for the sale and shipment of a certain amount of coal in each month during a period named, it appeared that there were printed at the head of the paper on which the contract was written the words "Sales subject to strikes, accident or causes beyond our control." In the body of the contract were the words "in case of strikes at the mines then such portion as should have been shipped during that period is to be cancelled." During the period in which the deliveries were required there was a strike in anthracite coal mines which seriously affected the coal business in regard to bituminous as well as to anthracite coal. The judge ruled that the words "Sales subject to strikes, accident or causes beyond our control" at the head of the paper formed a part of the contract, and added "but the word 'strikes' means strikes at the defendant's mines." The judge refused a request of the defendant to rule that "Upon the evidence at the time of making the contract there was an established custom in the coal trade in Pennsylvania that all sales were subject to strikes, accident, and causes beyond the control of the seller." The judge, however, did rule that "Upon the evidence the delivery of coal by the defendant under its contract was subject to strikes, accident, and causes beyond its control," although he found as a fact that the defendant did not bring itself within the terms of the request. *Held*, that the ruling last quoted and the finding of fact by the judge, made it unnecessary to pass upon the judge's ruling that the word "strikes," in the sentence at the head of the paper meant strikes at the defendant's mines or upon his refusal to make the ruling requested in regard to the existence of the alleged custom, as the defendant could not have been aggrieved by this ruling and refusal to rule whether they were correct or not.

In an action by a coal dealer against the owner of coal mines for the alleged breach of a contract in writing for the sale and shipment of a certain amount of coal in each month during a period named, the contract containing a clause making the deliveries of coal subject to strikes, accident and causes beyond the control of the defendant, the trial judge ruled in substance that the defendant would not be liable for deficiencies on its part which were due to a strike or a shortage of cars or other causes beyond its own control, if under the circumstances it had treated the plaintiff fairly and ratably with reference to the various other parties with whom it was dealing, and that the defendant was not bound under the terms of the agreement to deliver to the plaintiff the whole amount of its order to the exclusion of other customers entitled to receive coal under contracts with the defendant. The judge added the following: " But when the defendant was in default to the plaintiff, or when it became reasonably apparent to the defendant that it could not supply the coal called for under its contract with the plaintiff, it could not then enter into new obligations and rely upon deliveries of coal in fulfilment of such obligations to support its defense that its default to the plaintiff arose from causes beyond its control." *Held*, that the general ruling was correct, and that the additional ruling also was correct.

Where at a trial relevant evidence has been admitted without objection it has become a part of the case even if it might have been excluded upon objection.

If the president of a corporation, who is its chief executive officer, makes a state-

ment in a letter, written by him in his official capacity in conducting the business of the corporation, upon a matter which naturally would be within his personal knowledge, his statement is admissible in evidence in an action against the corporation in which the statement is relevant as an admission of the defendant.

In an action for the alleged breach of a contract in writing for the sale and shipment at a port named of a certain amount of coal in each month during a specified period, where it is admitted by the defendant that the plaintiff was bound to have vessels at certain piers at the times when the defendant ought to have delivered the coal, if it appears that the defendant did not supply coal for these vessels to the extent and at the times required by the contract, the plaintiff is entitled to recover as an element of his damages any payments for demurrage, incurred by him under reasonable contracts with the owners of vessels, which are found to have been a direct and natural consequence of the defendant's failure to furnish the coal on time.

CONTRACT for damages incurred by reason of the alleged failure of the defendant to deliver coal to the plaintiff at the times and in the amounts required by the terms of a contract in writing between the plaintiff and the defendant dated August 13, 1902. Writ dated November 3, 1904.

In the Superior Court the case was tried before *Schofield*, J., without a jury. The case had been referred to James D. Colt, Esquire, as auditor. At the trial the plaintiff put in evidence the report of the auditor, and rested. The defendant then introduced depositions and documents used in evidence before the auditor and some further testimony not put in before the auditor. The plaintiff in rebuttal put in evidence other depositions and documents used before the auditor, and there also was put in evidence by each party a large amount of correspondence between the parties used before the auditor.

The contentions of the parties were stated at the beginning of the auditor's report as follows:

"The case is an outgrowth of the anthracite coal strike of 1902, which began on April 10 and ended on November 26 of that year, and which seriously deranged the coal business of north-eastern United States, both as regards anthracite and bituminous coal.

"The plaintiff is a corporation engaged in the business of buying and selling coal in Boston and vicinity, and the defendant is a corporation, owning coal mines and doing business in Philadelphia, Pennsylvania. The defendant is a coal producer. Its coal is wholly of the bituminous variety, and its mines are

located in Pennsylvania on one of the branch lines of the Pennsylvania Railroad."

" The plaintiff, in its declaration, alleges that on or about August 12, 1902, a contract for coal was entered into in the shape of an offer and an acceptance which were as follows:

" ' Pennsylvania Coal & Coke Co.
Arcade Building.

" ' J. L. Mitchell, President.    Sales subject to strikes, accident
  Bituminous coal.           or causes beyond our control.
Furnace and foundry coal.    Railroad weights govern all sales.

" ' Philadelphia, August 13, 1902.
" ' Garfield & Proctor Coal Company,
       Boston, Mass.

" ' Dear Sirs, — Confirming our verbal agreement with your Mr. Spring, we have this day sold you 50,000 tons bituminous coal to be shipped as follows : 2,500 tons per month from September 1, 1902, until April 1, 1903, at price of $2.80 per gross ton f. o. b. vessel at South Amboy, balance of tonnage, about 32,500 tons, to be shipped in about equal monthly proportions between April 1 and September 1, 1903, at the price of $2.60 per gross ton f. o. b. vessel at South Amboy.

" ' It is understood, should you desire to load any portion of this tonnage at Philadelphia, instead of South Amboy, we will furnish it at the same basis of price, you to give us proper notice at any time you want destination of shipments changed.

" ' It is also understood that at any time we have coal to spare for all-rail shipments, in excess of the present contract between yourselves and Mr. Mitchell for 20,000 tons to Mechanicville, we will make shipment to that point if so instructed by you, and apply this tonnage on the present contract of 50,000 tons at price of $1.40 per gross ton f. o. b. mines.

" ' Should we fail to ship you the full tonnage due you from September 1, 1902, to April 1, 1903, in about equal monthly quotas, we authorize you to go out into the open market and buy any balance unshipped, sending us bill for the difference in price, if any, with this proviso, however, that in case of strikes at the mines then such portion as should have been shipped during that period is to be cancelled.    The above figures are based

on the present rates of freight. Should there be any change in freight rates after April 1, 1903, a corresponding change to be made in these prices.

"'Payments cash thirty (30) days from date of Bill Lading.

"'Yours truly,

"' Pennsylvania Coal and Coke Co.

J. L. Mitchell, President.'"

"'We hereby confirm and accept the above contract and all conditions as set forth. In case we should fail to take the required monthly tonnage we authorize you to sell the same in the open market, if you so desire, and send bill to us if any loss is sustained on any tonnage so disposed of.

"' Garfield & Proctor Coal Co.

W. W. Spring, V.-P.'"

"That the defendant delivered only a portion of the fifty thousand tons called for by the contract and refused and neglected to deliver the balance of the coal; that a large part of the portion delivered was delivered only after great and unreasonable delay, and that the defendant refused to load certain vessels and greatly delayed the loading of others, chartered and sent by the plaintiff to carry the coal, thereby obliging the plaintiff to pay large sums of money as demurrage to the owners of such vessels."

"Upon request the plaintiff filed specifications as follows:

"First. Approximately the number of tons that the defendant failed to deliver under the contract set forth in the declaration is three hundred and twenty-eight tons.

"Second. Instead of shipping fifty thousand tons of coal to the plaintiff as follows: — namely, twenty-five hundred tons of coal per month from September first, 1902, to April first, 1903, and thirty-two thousand five hundred tons in about equal monthly proportions between April first, 1903, and September first, 1903, as provided in said contract, — the defendant shipped in each of the months specified in the following table the amount of coal set against each month, and no more, from which the great and unreasonable delay of the defendant in performing the contract appears:

1902

| | |
|---|---|
| September . . . . . . . . . | 596.4 |
| October . . . . . . . . . . | 1,566.4 |
| November. . . . . . . . . . | 3,255. |
| December. . . . . . . . . . | No coal furnished |

1903

| | |
|---|---|
| January . . . . . . . . . . | 1,345 |
| February . . . . . . . . . . | 2,828 |
| March . . . . . . . . . . . | 4,031 |
| April . . . . . . . . . . . | 6,661 |
| May . . . . . . . . . . . | 4,540 |
| June . . . . . . . . . . . | 8,184 |
| July . . . . . . . . . . . | 7,909 |
| August. . . . . . . . . . . | 8,757 |
| | 49,672.8 |

"Third. A memorandum of the demurrage paid on account of delayed shipments by the Pennsylvania Coal & Coke Company under the contract set forth in the plaintiff's declaration is as follows:

| Dates of Bills of Lading. | Name of Vessel. | Amount paid for Demurrage. |
|---|---|---|
| January 1, 1903 | J. F. Potter | $2,143.75 |
| February 9 | Marie Palmer | 494.90 |

"The defendant filed an answer in which it alleges that the contract expressly provided that sales were subject to strikes, accidents, or causes beyond its control; that during the period covered by the contract it made every effort to furnish coal to the plaintiff as called for by the contract; that prior to the termination of the period covered by the contract it delivered 49,672.8 tons of coal to the plaintiff, leaving only 327.2 tons to be delivered, which 327.2 tons the plaintiff declined to receive; that the plaintiff waived its right to have the coal delivered at the times and in the quantities set forth in the contract; and that, in so far as the coal was not delivered as provided by the contract, the defendant was prevented from making deliveries by reason of strikes, loss of coal *en route,* delays in transporta-

tion, scarcity of cars and other accidents, and causes beyond its control.

" The defendant in opening contended that, taking the whole contract together and the circumstances surrounding it, it called for a fair monthly average delivery of twenty-five hundred tons; that, as soon as coal was loaded on a vessel at Greenwich Piers in Philadelphia, such loading constituted a delivery of coal to the plaintiff; and that the evidence would show a waiver on the part of the plaintiff of any provision of the contract which called for the delivery of twenty-five hundred tons a month from September 1, 1902, to April 1, 1903. The defendant also contended that it was relieved from the obligations of its contract, which provided that sales were subject to strikes, accident, and causes beyond the defendant's control, in that, owing to the anthracite strike, there was an extraordinary demand for bituminous coal and a consequent shortage of coal cars with which to carry its coal to the delivery point; that the car shortage continued until the spring of 1903; that the Pennsylvania Railroad, the only road to its mines, would not or could not furnish cars; that said railroad, for its own necessities, confiscated some of the defendant's coal in transit; and that the defendant's delivery of coal under the contract was prevented and hindered by these causes, which causes were beyond its control.

" The defendant also contended that upon its failure to deliver the coal as agreed the plaintiff should have gone out into the open market, in the manner provided in the contract, and purchased coal enough to make up the deficiency in shipments, sending a bill for the same to the defendant, and that, not having done so, it cannot now recover. It was also contended that the charter parties made by the plaintiff for the two vessels on which it had to pay demurrage were unreasonable in their provisions, and that consequently the defendant is not liable to reimburse the plaintiff for this demurrage.

" The price of coal at Philadelphia was thirty cents a gross ton less than at South Amboy, the difference being wholly due to the difference in freight charges. All the coal shipped under the contract was shipped from Philadelphia.

" The amount of coal shipped and invoiced by the defendant to the plaintiff, the amount of shortage claimed by the plaintiff,

and the amount loaded on board vessels of the plaintiff at Greenwich Piers, is shown by the following table:

| 1902 | Shipped. | Shortage. | Loaded on Vessels. |
|---|---|---|---|
| September . . . . | 596.4 | 1,903.6 | 596.4 |
| October . . . . | 1,566.4 | 933.6 | 2,703.4 |
| November . . . . | 3,255 | 0 | 2,118 |
| December . . . . | 0 | 2,500 | 0 |
| January . . . . | 1,345 | 1,155 | 2,160 |
| | 6,762.8 | 6,492.2 | 7,597.8 |

"There was no shortage subsequent to January, 1903. After that month the defendant began shipping coal in large quantities, 2,828 tons in February, 4,031 tons in March, and so on up to and including August, when the total amount shipped equalled 49,672.8 tons, or 327.2 tons less than the 50,000 tons called for by the contract. As to this 327.2 tons, no question is raised and no claim is made.

"Beginning early in September, shortly after the contract was signed, the market price of coal, such as was called for by the contract, began to rise. It rose as high as eight dollars a ton, and the price remained high until the early spring of 1903, when it fell back to about normal.

"The plaintiff contends that it is entitled to recover of the defendant as damages the difference between the market price and the contract price of so much of the coal as was not shipped on time, the market price to be taken as of the time when the coal should have been shipped. It also claims compensation by way of special damages for the amount of demurrage it was obliged to pay the owners of two vessels which it had chartered to load with the coal at Philadelphia in December and January, and which, by reason of the defendant's delay in furnishing the coal, were kept waiting at Philadelphia beyond the lay days specified in the charter parties, thereby obliging the plaintiff to pay demurrage."

The facts found by the auditor so far as necessary to an understanding of the points of law are stated or described in the opinion.

The defendant asked for the following twenty-two rulings,

which were disposed of by the judge in the manner stated after each :

" 1. Under the contract and upon the evidence the defendants were only bound to deliver to the plaintiff from September 1, 1902, to April 1, 1903, a fair monthly average of two thousand to three thousand tons of coal." Refused.

" 2. What constitutes a fair monthly average is a question of fact." Refused.

" 3. The contract is not to be construed as comprising separate independent contracts on the part of the defendant to deliver to the plaintiff twenty-five hundred tons of coal in each month from September 1, 1902, to April 1, 1903." Granted. " The contract is one contract of sale, with stipulations for delivery in separate instalments."

" 4. Coal is shipped within the meaning of the contract when the monthly amount called for by the contract is delivered free on board vessel or vessels at Philadelphia.

" 5. Coal is shipped within the meaning of the contract when the monthly amount called for by the contract is delivered free on board vessel or vessels at Philadelphia, without regard to whether it completes the loading of such vessel or vessels." This and the preceding request refused, " but the defendant was not bound to load more than twenty-five hundred tons per month upon any vessel or vessels which the plaintiff might furnish."

" 6. Upon all the evidence the plaintiff waived its right to require the shipment of coal in the amounts and at the times called for by the contract." Refused.

" 7. The acceptance by the plaintiff of the full amount of coal under the contract and payment in full for the same without objection on the ground of delay constitutes a waiver of claim for damages for failure to deliver in the amounts and at the times called for by the contract." Refused.

" 8. The words ' Sales subject to strikes, accident or causes beyond our control,' at the head of the contract, form a part of the contract." Granted, " but the word ' strikes ' means strikes at the defendant's mines."

" 9. Upon the evidence at the time of making the contract there was an established custom in the coal trade in Pennsyl-

vania that all sales were subject to strikes, accident, and causes beyond the control of the seller." Refused.

"10. Upon the evidence the delivery of coal by the defendant under its contract was subject to strikes, accident, and causes beyond its control." Granted, "but under the facts found the defendant does not bring itself within the terms of request."

"11. Upon the evidence the defendant was prevented from delivering coal in the manner and at the times called for by the contract, by reason of a general strike prevailing in Pennsylvania." Refused.

"12. Upon the evidence the defendant was prevented from delivering coal in the manner and at the times called for by the contract by reason of causes beyond its control, namely, car shortage and delays in transportation and confiscation of coal by the railroad." Refused.

"13. Failure of the plaintiff to buy coal to fill deficiencies and to notify the defendant and to send bills for the difference in price or to make any demand for such difference constitute a waiver of claim for damages." Refused.

"14. Upon all the evidence the defendant was under obligation to carry out the contracts entered into by J. L. Mitchell prior to the transfer of his collieries by him to the defendant." Refused.

"15. The defendant was not bound to deliver to the plaintiff the whole amount of its order to the exclusion of the defendant's other customers. The defendant was only bound to deliver to the plaintiff such proportion of defendant's reduced means of supply as the amount of the plaintiff's order bore to the whole amount of the defendant's sales, including the ordinary amount of its home trade." Granted, "with the addition after the word 'customers' of the following clause, viz.: 'entitled to receive coal under contracts with the defendant'; and adding at the end the following, viz.: 'But when the defendant was in default to the plaintiff, or when it became reasonably apparent to the defendant that it could not supply the coal called for under its contract with the plaintiff, it could not then enter into new obligations and rely upon deliveries of coal in fulfilment of such obligations to support its defense that its default to the plaintiff arose from causes beyond its control.'"

"16. The defendant was only bound to distribute such coal as it was able to deliver ratably among its orders on hand at the time of the shortage of cars." Refused.

"17. If the defendant supplied coal on orders given subsequently to the plaintiff's contract, this fact is immaterial if the amount so supplied would not have increased the plaintiff's fair proportion, had such coal been distributed ratably upon all contracts." Granted.

"18. Upon the evidence the contract in suit is a contract for the sale of product of defendant's mines." Refused.

"19. Upon the evidence the defendant, if prevented by reason of car shortage from supplying plaintiff with coal in the amounts and at the times called for by the contract, was under no obligation to purchase coal to supply the deficiency." Refused. " The defendant was bound to make reasonable efforts to obtain and deliver from any available source the quantity of coal which it had contracted to sell to the plaintiff."

"20. The plaintiff is not entitled to recover demurrage incurred by the schooners 'Jennie French Potter' and 'Marie Palmer.' Such damage is too remote." Refused.

"21. Upon the evidence the plaintiff was bound to have vessels at Greenwich Piers when the defendant was bound to deliver the coal, and, as the defendant had the whole of each month in which to deliver it, the lay days should not expire till the end of a month. The lay days of the 'Jennie French Potter' expired December 24 at 8 A.M. The plaintiff cannot recover demurrage for the period from December 24 to December 31, inclusive." Granted.

"22. Upon all the evidence the defendant is entitled to a verdict." Refused.

The judge also made the following findings and rulings:

"1. After examining all the evidence and considering the arguments of counsel, the court in this case has reached substantially the same conclusions as the auditor, except as to one item of damages, explained below. The report of the auditor is confirmed and adopted by the court with the exception above stated, but it may be useful to refer specifically to a few of the important questions in controversy.

"First, in regard to the words 'in about equal monthly

quotas,' which were inserted by the plaintiff in the proposition submitted by the defendant to it, the court takes this view, viz.: Those words were intended primarily to limit the broad language used by the defendant in the last paragraph; namely, 'Should we fail to ship you the full tonnage due you from September 1, 1902, to April 1, 1903,' under which the defendant might assert the right to ship the coal between September and April in such instalments and at such times as it saw fit. Reading the various provisions of the contract together, including the words inserted by the plaintiff, it seems to the court to be a fair construction to say that the defendant was bound to ship the coal in about equal monthly instalments, with the quantity of twenty-five hundred tons fixed as a minimum limit which the defendant must ship in each month between September and April. The words ' 2,500 tons per month ' cannot be rejected arbitrarily, and by treating them as fixing a limit which the defendant must reach effect is given to those words as well as to the words ' in about equal monthly quotas.' If the defendant failed to ship as much as twenty-five hundred tons in any month between September and April, it was in default, and had the burden of showing legal excuse for the default. Correspondence between the parties prior to the making of the contract was admitted in evidence against the objection of the plaintiff as an aid to construction, and the court holds it was competent. See *Smith* v. *Vose & Sons Piano Co.* 194 Mass. 193 ; *United States* v. *Bethlehem Steel Co.* 205 U. S. 105 ; Thayer, Prelim. Treatise on Evidence, 483, at end.

" 2. At the trial the defendant introduced evidence which had not been submitted to the auditor upon the question whether the defendant was under a legal obligation to perform the contracts of Mr. J. L. Mitchell made prior to July 30, 1902. Some of this evidence was admitted against the objection and exception of the plaintiff. From the evidence in favor of the defendant an inference might well be drawn that the defendant corporation legally undertook to perform the contracts of J. L. Mitchell as his successor in business, but that inference is repelled by the letter of Mr. W. A. Lathrop, president of the defendant corporation, introduced in evidence as Exhibit 188, and transcribed in the auditor's report. The court gives great weight to that

letter upon this issue of fact. It is the statement of a man of business written in his official capacity as president of one of the contracting parties to the other contracting party in a commercial contract where the fundamental rule is *bona fides*, and in regard to facts upon which the best sources of knowledge were open to the writer. Upon all the evidence the court finds as a fact that the defendant is not shown to have been under a legal obligation to perform the J. L. Mitchell contracts made prior to July 30, 1902.

" 3. In regard to damages for non-shipment in accordance with the contract the court rules that ordinarily the measure of damage would be the difference between the contract price and the market price at the end of each month, but the fundamental principle of damages for breach of contract is compensation. The plaintiff is to be made whole for the loss it has sustained by the breach. The amount expended by the plaintiff in obtaining coal to supply the shortage caused by non-shipment measures one element of damage exactly, provided the amount was reasonably expended. The court finds as a fact that the amount was reasonably expended, and adopts and confirms the finding of the auditor upon this point, $18,244.30.

" In regard to the item of demurrage the court finds that the defendant might reasonably be expected to have foreseen at the time the contract was made that the plaintiff might have demurrage charges to pay if a vessel was unduly delayed in loading. Such charges would be a natural and proximate result of the delay. In order to enable the plaintiff to recover as damages sums paid on account of demurrage, it must prove that the liability for demurrage was due to the default of the defendant. In regard to the ' Marie Palmer ' this fact was proved and the entire charge of $494.90 is allowed. In regard to the ' Jennie French Potter ' the defendant has made a point which seems to the court to be sound. The total charge for demurrage on this vessel is $2,143.75, being at the rate of $150 per day for fourteen days and seven hours, extending from 8 A. M. on December 24, 1902, to 3 P. M. on January 7, 1903. Exhibit 224 W. The lay days agreed upon in the charter party expired at 8 A. M. on December 24. The defendant was not then in default. Under its contract it was entitled to the remaining days in December

in which to load, and it has not waived its right. The charge on account of this vessel is reduced to $943.75, and allowed as damages for that amount.

"4. Upon the whole case the court finds for the plaintiff and assesses damages in the sum of $23,605.87, made up as follows, viz.: principal sum, $19,682.95, with interest computed on $1,438.65 (the amount allowed to reimburse demurrage charges), from February 26, 1903, to the date of this finding, and on the balance of $18,244.30 from the date of the writ, November 3, 1904, to the date of this finding."

The defendant alleged exceptions.

*B. L. M. Tower,* (*E. O. Hiler* with him,) for the defendant.

*H. Wheeler,* for the plaintiff.

SHELDON, J. We are of opinion that the contract in suit called for a shipment of twenty-five hundred tons of coal per month from September 1, 1902, to April 1, 1903. The express language of the defendant's agreement was that the shipments of coal were to be "2500 tons per month" during that time, at a price of $2.80 per ton; and this is followed by the stipulation that the remainder of the coal should be shipped "in about equal monthly proportions" during the remainder of the period stated, at a lower price. The contract made a clear distinction between the absolute engagement for the shipment of a fixed quantity during the first months of the time provided for and the qualified stipulation for subsequent shipments "in about equal monthly proportions," although each part of the undertaking was made subject to strikes, etc. The subsequent stipulation providing a mode for the assessment of damages if shipments were not made in "about equal monthly quotas," cannot control the express stipulation with which the contract opens. This latter clause was inserted, not for the purpose of defining the obligation assumed by the defendant, but to provide a ready means of settling the damages and making a resort to litigation unnecessary if the defendants should fail to ship in about equal monthly quotas the amount stipulated for during the first period. The utmost effect that can be given to the words "in about equal monthly quotas" in this clause is to treat them as giving to the defendant liberty to ship somewhat more than twenty-five hundred tons in any particular month. This was the construction

of the contract adopted by the learned judge of the Superior Court before whom the case was tried; and it was correct. The defendant was in default for a failure to ship the stipulated amount of twenty-five hundred tons during any one of these months, and would be liable therefor in damages unless there was some legal excuse for such default.

The correspondence and negotiations between the parties before the making of the contract were indeed competent under the circumstances of the case as an aid in construing the language in which they finally embodied their contract. *Smith* v. *Vose & Sons Piano Co.* 194 Mass. 193.   *United States* v. *Bethlehem Steel Co.* 205 U. S. 105.   But it remains true, as was stated in both of these cases, that this evidence is received, not to frame a new contract between the parties, but to enable the court to understand the subject matter of the agreement as it lay in their minds, and to determine the meaning which they themselves put upon any doubtful or ambiguous terms which may have been used, and so to apply their language correctly to the subject matter which was in their contemplation. Merely tentative offers made by either party while they were endeavoring to reach an agreement cannot control the plain meaning of the contract which they finally concluded.

Accordingly the defendant's first and second requests for rulings were rightly refused.

The judge refused to give the defendant's fourth and fifth requests, but did rule that the defendant was not bound to load more than twenty-five hundred tons per month upon any vessel or vessels which the plaintiffs might furnish. The coal was all actually shipped at Greenwich Piers in Philadelphia, in accordance with the option given in the contract. The facts found by the auditor and the rulings made by him, which were substantially adopted by the judge, were as follows: " Was the date when the coal was put on the vessel at Greenwich Piers the date of shipment?   Greenwich Piers is a shipping point for coal, and is located on the Delaware River in Philadelphia.   There is no storage for coal on the piers, and the method of loading vessels is briefly as follows: A vessel arriving for coal anchors in the stream to await her turn to load.   As soon as opportunity offers, she takes her place at the piers and the coal is dumped into her

from the railroad cars which have brought it from the mines. When the vessel is loaded, the coal is billed to the consignee, and the vessel leaves the piers. This method was followed by the defendant in the present case. The plaintiff was bound to furnish vessels for the coal which the defendant had contracted to ship, and, when coal was dumped by the defendant into the plaintiff's vessel, a delivery of coal was made. I am not, however, able to find, in accordance with the defendant's claim, that the date of dumping the coal was the date of shipment. If this were so, then the dumping of a hundred tons of coal in October into a twenty-five hundred ton vessel which was not loaded until some time in November would constitute an October shipment of coal. The intention and clear meaning of the contract was that the defendant should place twenty-five hundred tons of coal each month on vessels to be furnished by the plaintiff, so that the vessel or vessels could, during the month, sail for their destination with at least twenty-five hundred tons. It was the plaintiff's duty to furnish each month vessels capable of carrying the twenty-five hundred tons, and failure to do so would excuse the defendant. On the other hand, if the plaintiff, in any one month, sent a vessel capable of carrying more than twenty-five hundred tons, the defendant's obligation for that month ceased upon its loading twenty-five hundred tons into such vessel during the month. If the plaintiff saw fit to hold the vesssel over for a full cargo, it could not afterwards claim as to that month that the defendant had failed to live up to its obligations. The defendant billed no coal to the plaintiff until the vessels were loaded and ready to sail. I find, in accordance with what was evidently the understanding of both parties, that the date when the vessels were loaded and ready to sail was the date of the shipment."

Undoubtedly the defendant is right in its contention that the general rule is that goods are shipped when they are put on board of the vessel or vehicle in which they are to be carried, and that an agreement to deliver goods previously unascertained free on board of a vessel or other vehicle of transportation is satisfied and the title passes to the purchaser and the goods are at his risk when the proper goods are actually loaded on board for shipment. The cases cited by the defendant's counsel fully support this general doctrine. *Bowes* v. *Shand,* 2 App. Cas. 455. *Ex parte*

*Rosevear China Clay Co.* 11 Ch. D. 560, 569.  *Brown* v. *Hare*, 4 H. & N. 822, 829.  *Mora y Ledon* v. *Havemeyer*, 121 N. Y. 179.  *Congdon* v. *Kendall*, 53 Neb. 282.  *Clark* v. *Lindsay*, 19 Mont. 1.  But in these decisions the courts were dealing with cases in which all the goods that then were to be shipped had been delivered on board of the cars or vessels, and the seller had done all that he could do to secure the dispatch of all the goods that he was bound then to deliver.  A very different state of affairs would have been presented if in *Mora y Ledon* v. *Havemeyer, ubi supra,* for example, the plaintiffs had seasonably put on board of the vessel only a portion of the quantity of sugar which they had agreed to deliver within thirty days; and a like statement may be made of the other cases above cited.  Here, it was the duty of the plaintiff to furnish vessels of sufficient capacity to carry the coal which the defendant was to ship, and the defendant was under obligation to ship upon such vessels the stipulated amount of coal.  No vessel could depart until it had on board a sufficient amount of coal, and it was the defendant's duty to furnish such amount for each vessel, subject to the limitation that it was not bound to ship more than twenty-five hundred tons in any one month.  Upon the facts found, there was no error in the rulings made upon this subject.

Nor was the judge bound to rule that the plaintiff as matter of law had waived either its right to require the shipment of coal in the amounts and at the times called for by the contract, or its right to claim damages for the defendant's failure to make such shipments.  The testimony of Spring, the plaintiff's vice president and buyer, and the fact that the defendant had finally shipped substantially all the coal stipulated for, and Mitchell's testimony that the plaintiff had received and paid for all this coal without any reservation or claim for damages on account of delay, undoubtedly furnished some evidence to sustain this contention of the defendant.  *Blodgett* v. *Foster*, 120 Mich. 392. *National Contracting Co.* v. *Vulcanite Portland Cement Co.* 192 Mass. 247.  *Merrimack Manuf. Co.* v. *Quintard*, 107 Mass. 127. But there was evidence that the plaintiff's statements of satisfaction with the conduct of the defendant, and its acts bearing in the same direction, were made and performed in ignorance of what was afterwards discovered to have been unfair treatment

of the plaintiff by the defendant and an unjustifiable failure of the defendant to make shipments which it was fairly able to make and ought to have made; and it is elementary law that no binding waiver of one's rights can be made in such a case as this by one who is ignorant of the facts upon which those rights depend and out of which they grow. Such a waiver to be effectual must be made intentionally and with full knowledge of the material facts. *George N. Pierce Co.* v. *Beers*, 190 Mass. 199. *Metropolitan Coal Co.* v. *Boutell Transportation & Towing Co.* 185 Mass. 391. *Bennecke* v. *Insurance Co.* 105 U. S. 355, 359. *Pence* v. *Langdon*, 99 U. S. 578, 581. *Boynton* v. *Braley*, 54 Vt. 92. Nor did the plaintiff, by taking what it could get under its contract when it could get it, necessarily and as matter of law waive its claim for damages for a failure to make shipments at the agreed times and in the agreed quantities. *Garfield & Proctor Coal Co.* v. *Fitchburg Railroad*, 166 Mass. 119. *Dignan* v. *Spurr*, 3 Wash. 309. *Whalon* v. *Aldrich*, 8 Minn. 346. *Belcher* v. *Sellards*, 43 S. W. Rep. 676. *Clydebank Engineering Co.* v. *Yzquierdo*, [1905] A. C. 6.

Nor did the plaintiff's failure to buy coal to fill the deficiencies in the defendant's shipments and to send bills to the defendant for the difference in price, or to make any demand for such difference, constitute a waiver of its claim for damages. The clause in the agreement allowing the plaintiff to do this was inserted for its benefit, and gave to the plaintiff a privilege to be exercised or not at its option. It was not provided as the exclusive means for ascertaining or liquidating the plaintiff's damages. The case is like *Fisher* v. *Barrett*, 4 Cush. 381. A similar clause in a contract for the delivery of lumber was construed in the same way in *Williston* v. *Mathews*, 55 Minn. 422.

The defendant's sixth, seventh and thirteenth requests were rightly refused.

The eighth request was given with the qualification that the word "strikes" meant strikes at the defendant's mines. The defendant contends that this was incorrect, on the authority of *Davis* v. *Columbia Coal Mining Co.* 170 Mass. 391. In view of the proviso near the end of the contract, where "strikes at the mines" are spoken of, it may be doubted whether the rule of *Davis* v. *Columbia Coal Mining Co.* should be applied here.

But we need not pass upon this question.  As its tenth request was given, the defendant was not aggrieved by this modification of its eighth request.  The finding made as to the facts involved in its tenth request would have been equally fatal to the defendant if its eighth request had been given in terms.  And for the same reason the defendant was not aggrieved by the refusal to give its ninth request.

The questions raised by the refusal to give the defendant's eleventh, twelfth and fourteenth requests may be considered together.  The judge ruled in substance that the defendant would not be liable for deficiencies on its part which were due to a strike or a shortage of cars or other causes beyond its own control, if under the circumstances it had treated the plaintiff fairly and ratably with reference to the various other parties with whom it was dealing; that the defendant was not bound under the terms of the agreement to deliver to the plaintiff the whole amount of its order to the exclusion of other customers.  This was correct.  *Oakman* v. *Boyce,* 100 Mass. 477.  *Jessup & Moore Paper Co.* v. *Piper,* 133 Fed. Rep. 108.  *Luhrig Coal Co.* v. *Jones & Adams Co.* 141 Fed. Rep. 617.  *McKeefrey* v. *Connellsville Coke & Iron Co.* 56 Fed. Rep. 212.  But the judge found that the defendant, under the rule of law adopted, might have made all the shipments to the plaintiff when and as it had agreed to make them; and the defendant contends that this finding was not warranted by the evidence.  Whether this was so or not might have been found to depend upon the question whether the defendant had assumed and become bound by certain numerous contracts for the sale and delivery of large quantities of coal which had been made by one Mitchell before the incorporation of the defendant.  The defendant afterwards became the owner of Mitchell's mines and succeeded to his business.  The defendant had, in each month after July 30, 1902, when it was organized and began making contracts for the sale and delivery of coal, more than enough coal available to satisfy the requirements of all of its own contracts; but it undertook also to carry out the contracts which before July 30, 1902, had been made by Mitchell; and the defendant's failure to comply with its own contracts, including that with the plaintiff, was due, partly at least, to the fact that it made so large deliveries

under the Mitchell contracts as to leave it unable to fulfil its own obligations. The auditor found that the defendant had not assumed and become bound by the Mitchell contracts. He also found that in every month in which there was a shortage on the plaintiff's contract the defendant shipped on one or more subsequently made contracts more coal than such subsequent contracts called for. And the auditor found and reported that the defendant was not prevented from making the shipments called for by the plaintiff's contract by reason of car shortage or other condition of the coal trade beyond its control, and ruled also that the conduct of the defendant in delivering coal on its own contracts made after and when in default on the plaintiff's contract, deprived it of the defense which otherwise might have been open to it that it was prevented from making shipments by causes beyond its own control.

In spite of the very able argument of the defendant's counsel, we find no error in this. The judge was not bound as matter of law to find upon the new evidence that the company had assumed and become bound by the Mitchell contracts. Whatever the new evidence might have been, the auditor's report was *prima facie* evidence in favor of the conclusion reached by the judge at the trial. The defendant's argument that the letter in which Lathrop, the defendant's president, asserted that the defendant had not assumed the Mitchell contracts, ought not to have been considered upon this question, if it were otherwise valid, would be answered by the fact that it was offered in evidence and admitted without objection. *Demelman* v. *Brazier*, 193 Mass. 588, 592. But the argument is not valid. This was a statement made by the defendant's president, its chief executive officer, in his official capacity, in the conduct of its business, upon a matter which naturally would be within his personal knowledge. The decisions relied upon by the defendant, like *Boston Hat Manuf. Co.* v. *Messinger*, 2 Pick. 223, and *Robinson* v. *Fitchburg & Worcester Railroad*, 7 Gray, 92, are not applicable. The judge's findings upon these questions of fact are conclusive.

Nor is there anything in *Oakman* v. *Boyce*, 100 Mass. 477, and *McKeefrey* v. *Connellsville Coke & Iron Co.* 56 Fed. Rep. 212, before referred to, to justify the contention of the defend-

ant that it could excuse, even proportionally, its failure to keep its contract with the plaintiff when it was able to do so without discriminating against those entitled under its other contracts, by making new contracts with others, after the exigency upon which it now relies had arisen. The defendant's fifteenth request was rightly modified; and its sixteenth and eighteenth requests were rightly refused. The exception to the refusal to give the nineteenth request has not been argued, and we treat it as waived. It should not have been given in any event. *Summers* v. *Hibbard*, 153 Ill. 102, 110. Nor was the defendant aggrieved by its refusal, in view of the finding that it had coal enough to fill all its own contracts.

As the twenty-first request was given, the only remaining question is whether the damages for demurrage sustained by two schooners should have been refused as being too remote. It must be remembered that the plaintiff was bound to have vessels at Greenwich Piers when the defendant ought to have delivered the coal ; and the judge so ruled at the defendant's request. If the defendant did not supply coal for these vessels to the extent and by the end of the period for which it had bound itself, a liability for demurrage well might be found to be the natural and probable result of this default of the defendant, and one which ought to have been within the contemplation of the parties. It was not like the expenses disallowed in *Globe Refining Co.* v. *Landa Cotton Oil Co.* 190 U. S. 540, 546, which would have been incurred by that plaintiff in any event, but was an additional expense caused to the plaintiff by the defendant's breach of its contract. It was like the increased freight rates allowed in *Merrimack Manuf. Co.* v. *Quintard*, 107 Mass. 127.

*Exceptions overruled.*