Hillsborough, }
April 3, 1923. }

## OSGOOD CONSTRUCTION COMPANY *v.* CLAREMONT.

The mutual understanding of the parties to a written contract as to the sense in
which they used the language of the writing may be shown by their parol
negotiations which preceded the agreement.

Where a contract for concrete work provided that the meaning of doubtful
specifications should be determined by the defendants' engineer his state-
ment to the plaintiffs concerning the meaning of the term "broken stone"
that "they might base their bid upon the use of local stone in the concrete"
is not an attempt to vary a written contract, but is admissible to show how
the parties understood a certain term therein before it was signed.

If a contract was made on the foregoing understanding and the use of local stone
proves wholly unsuitable and therefore is not used, the plaintiff is entitled
to recover the additional expense of furnishing foreign stone.

ASSUMPSIT, upon the common counts to recover the balance due
for the construction of certain additions to the water system of the
town.    Trial by the court.    At the close of all the evidence the
plaintiffs moved that a verdict be found in their favor for the amount
due them on the crushed-stone item according to the specifications
as amended, on the ground that such a verdict is required by the
law and evidence.

The motion was denied and plaintiffs excepted.    A verdict was
rendered for the defendants.

An exception was taken by the defendants to the admission of
evidence.    The facts appear in the opinion.

Transferred by *Branch,* J.

*Wason & Moran* and *Warren, Howe & Wilson* (*Mr. Howe* orally),
for the plaintiffs.

*Tuttle, Wyman & Starr* and *Ira G. Colby* (*Mr. Wyman* orally),
for the defendants.

PLUMMER, J.    In the spring of 1913, the board of water com-
missioners of the town of Claremont advertised for proposals or
bids for the construction of certain additions to the water system
of the town.    In response to this advertisement the plaintiffs made
a bid, and were awarded the contract.    The advertisement, form
of proposals, specifications and contract were drawn by Mr. Davis,
an engineer employed by the town, who had general charge of the

project. The controversy relates to the cost of constructing a con-crete dam at the "Dole Reservoir" so called. The material portion of the specifications is as follows: "Broken stone, if used, must be clean and of such size as will pass through a 1½ ring and over a half inch mesh screen. . . . Sand, broken stone or gravel will be at all times subject to the approval or rejection of the engineer, and he may require broken stone or gravel to be washed." For each cubic yard of concrete at either the Straw or Dole reservoirs, the sum of eleven dollars and fifty cents was to be paid the plaintiffs.

As stated by the court, it is the contention of the plaintiffs that in submitting their proposal and signing the contract, by which they agreed to place cement for eleven dollars and fifty cents per cubic yard, they acted upon the understanding that they would be allowed to use in the concrete local stone, crushed at the site of the work to the required size; that they were not in fact allowed to do this, but were required to bring in "foreign stone" by freight at a con-siderable increase in cost, and that they should, therefore, be allowed to recover from the town for this added expense.

On the day before the plaintiffs' bid was submitted to the board of water commissioners, Horace E. Osgood and Mr. Dudley, the plaintiffs' engineer, went to Claremont and looked over the location of the proposed work. Thereafter they undertook the preparation of the plaintiffs' proposal.

Mr. Osgood testified that when they came to consider the price for concrete, they discussed the matter of using local crushed stone, and concluded that the work might be more cheaply done if this were allowed; that then they went to the defendants' engineer, and asked him if they would be allowed to use local stone, and that he replied that they would. The plaintiffs' engineer was with Mr. Osgood when the conversation with the defendants' engineer occurred. He testified in regard to the conversation as follows: "Q. As a result of that talk did you and Mr. Osgood do anything? A. We went down and interviewed the engineer, Mr. Davis. Q. Where did you meet Mr. Davis? A. We found him just outside of the outer door of the hotel on the left-hand side. Q. What conversation took place there? [Exception by defendants.] A. Mr. Osgood asked Mr. Davis if he could base his proposal on the use of that local stone at the reservoir and about there, and Mr. Davis replied that he knew of no reason why he could not; and then Mr. Osgood asked him if he should base his proposal on that stone, and he said yes.

Q. And as a result of that, what did you and Mr. Osgood do? A. We went back and made out the proposal at a lower figure than we had originally arranged to make. The court: How much lower? Witness: I think $1.25 a yard. I think our original proposal was $12.75, and we reduced it to $11.50."

The defendants' engineer contradicted the above testimony, but the court found as follows: "The court accepts as true the statement of Mr. Dudley, that Mr. Davis told him and Mr. Osgood that he saw no objection to their basing their bid upon the use of native stone, and assented to their doing so."

When the work on the Dole reservoir commenced, test blocks were made by the plaintiffs' employees in which local broken stone was used. These test blocks were broken up by the defendants' engineer, and it then appeared that the local stone was wholly unsuitable for use in the concrete. The plaintiffs contend that the defendants thereupon forbid their use of the local stone. This is not assented to by the defendants. But the court found in relation to this matter that "it is clear, however, that Mr. Davis would not have permitted the use of local stone if the plaintiffs had undertaken to use it, and it appears to be of little consequence whether or not he had occasion to put this prohibition into words."

As a result of the test and decision that the local stone was unsuitable for use, the plaintiffs were compelled to buy stone from other places, and have it shipped to Claremont for use in the concrete, at an additional expense which the court has found was $2,428.53. The court rendered a verdict for the defendants, but states that if, upon the facts, it shall be held by the supreme court that the plaintiffs are entitled to recover, there should be judgment for the plaintiffs for the sum of $2,428.53 with interest from the date of the writ.

It appears that when the plaintiffs were engaged in preparing their proposal for submission to the defendants, it occurred to them that there might be a question under the specifications whether they could use the local stone in the concrete.

The specifications provided that "in case bidders suspect any possible difference of opinion between themselves and the engineer, as to the meaning and intent of any of these specifications, they must ascertain and bid upon the engineer's understanding of it, and the engineer's decision as to any of the foregoing matters shall be final and binding upon the parties hereto." Therefore the plaintiffs did exactly what the specifications required in such a situation, they

applied to the engineer to determine the question. They asked him if they could base their bid upon the use of native stone, and he told them that they could. Accordingly they did so, reducing their bid $1.25 a yard upon the understanding that they could use local or native stone in the concrete. They were required to use foreign stone at an additional expense, and there seems to be no reason why they should not recover such expense.

The court, after finding that the defendants' engineer had informed the plaintiffs that they might base their bid upon the use of local stone, said: "This statement, however, falls considerably short of Mr. Osgood's claim that Mr. Davis told them unconditionally that the local stone might be used, and is rather more consistent with the statement contained in Mr. Davis's letter, that he told several contractors that local stone might be used if it proved to be suitable." The court seems to make a distinction between telling the plaintiffs that they might use local stone and that they might base their bid upon using it.

If this were a suit for the contract price which the defendants resisted upon the ground that the plaintiffs had improperly used the local unsuitable stone, the question whether the engineer unconditionally consented to the use of such stone might be material. But the unsuitable stone was not used and no fault appears to be found with the plaintiffs' performance.

If the defendants accepted the plaintiffs' bid upon the basis of the lower price for local stone, they obtained the advantage of the use of such stone if it proved suitable. Making the contract in this way to obtain this advantage in price, they took the risk of the suitability of the local stone. Having taken the risk, they must bear the loss or extra expense rendered necessary by the discovery that the local stone could not be used.

The question therefore is, did the plaintiffs make their bid and the defendants accept it upon the understanding that "broken stone" in the contract meant local or native stone crushed on the site?

The plaintiffs were told that they might base their bid upon the use of local stone. That must connote that, if their proposal was accepted, and they were awarded the contract, they could use such stone. Otherwise the statement of the engineer to the plaintiffs that they could base their bid upon the use of local stone would be meaningless. The plaintiffs, of course, understood when they were informed that they could base their bid upon the use of local

stone, that they could use such stone, else what would be the purpose of submitting a bid upon the use of that stone at a less price per yard?

Giving the words used in the statement of the defendants' engineer to the plaintiffs their "natural and ordinary import" (*Barnstead* v. *Alton*, 32 N. H. 245, 252), the plaintiffs had a right to understand that, if their bid was accepted, they could use the local stone. This is the only reasonable interpretation that can be placed upon the language used. "What did the witnesses intend by the language used? This question is not solved by giving an arbitrary or unreasonable meaning to verbal testimony. In finding what a witness means it is not permissible to reach a result which reasonable men could not entertain. Upon such a question of fact, the finding or verdict must appear to be based upon some reasonable understanding of the meaning of language as understood and sanctioned by the court." *Theobald* v. *Shepard*, 75 N. H. 52, 55.

The facts present this situation. The plaintiffs when figuring upon their proposal, fearing there might be some misunderstanding relating to the use of stone in the concrete, seek the defendants' engineer, as directed by the specifications, for him to determine if they could base their bid upon the use of local stone. He informed them that they could, and they did so. In other words, his decision was that they could use local stone upon the work, if they secured the contract. The decision of the engineer, according to the specifications, was final and binding upon the parties.

When the contract between these parties was afterwards executed, it had already been determined that local stone could be used in the concrete, and the contract was signed with that understanding. The plaintiffs were compelled to buy and use foreign stone at an increased expense, and they should be recompensed therefor.

The defendants excepted to the admission of the plaintiffs' evidence that the defendants' engineer told one of the plaintiffs and their engineer that the plaintiffs might base their bid upon the use of local stone in the concrete. This exception cannot be sustained. The court ruled in admitting the evidence that it "was material in the light of the provision of the contract which refers bidders to the engineer for advise in case of doubt as to its meaning."

The ruling was undoubtedly correct. The introduction of this evidence was not an attempt to vary a written contract, but to show how the parties understood a certain term in the contract before it was executed. "It tended to show what they meant by

what they said." *New England Box Co.* v. *Flint*, 77 N. H. 277, 279. "The discussion of the general subject in the numerous cases in which the principle has been applied in this jurisdiction make it abundantly clear that the mutual understanding of the parties to a written contract, as to the sense in which they used the language of the writing, may be shown by their oral negotiations which preceded the written agreement." *Weston* v. *Ball*, 80 N. H. 275.

"If the previous negotiations make it manifest in what sense the terms of the contract are used, such negotiations may be resorted to as furnishing the best definition to be applied in ascertaining the intention of the parties. The sense in which the parties understood and used the terms of the contract is thus best ascertained." *Keller* v. *Webb*, 125 Mass. 88, 89; *Stoops* v. *Smith*, 100 Mass. 63; *Garfield &c. Co.* v. *Company*, 199 Mass. 22; *Putnam-Hooker Co.* v. *Hewins*, 204 Mass. 426; *Chicago Auditorium Ass'n* v. *Corporation*, 244 Ill. 532; *Grant* v. *Company*, 85 Conn. 421; *Lambert &c. Co.* v. *Carmody*, 79 Conn. 419.

The plaintiffs are entitled to a verdict, and in accordance with the finding of the superior court, they are entitled to recover $2,428.53 with interest from the date of the writ.

*The plaintiffs' exception is sustained: the defendants' exception overruled: judgment for the plaintiffs.*

YOUNG, J., was absent: PEASLEE, J., concurred in the result: the others concurred.