Samuel Oakman & another *vs.* James Boyce.

The defendant, a coal merchant in Baltimore, and owner of coal mines, contracted to ship to the plaintiffs in Boston five thousand tons of coal, to be shipped from time to time during nine months, "but if prevented or obstructed by breaches or other unavoidable occurrences on the railroads or at the mines, no claim for damages will be allowed." Breaches occurred on the railroad. At the trial of an action for nondelivery of the coal, the jury were instructed that the defendant was not bound to deliver to the plaintiffs the whole amount of their order to the exclusion of other customers, but that his obligation to the plaintiffs would be satisfied by delivery to them of such a proportion of his reduced means of supply as the amount of the plaintiffs' order bore to the whole amount of the defendant's sales, including the ordinary amount of his home trade. *Held,* that the instructions were correct.

A statement by a judge in his charge to the jury, in an action of contract, that if the contract had been performed to its full extent, and no conditions had exonerated the defendant, it would have been a very profitable matter to the plaintiff: that, as it resulted, he may have lost the opportunity of putting a profit of $15,000 or $20,000 in his pocket; and that it is a great disappointment to a man to lose such an amount as that, affords the plaintiff no ground of exception.

CONTRACT for the nondelivery of coal. At the trial in this court, before *Hoar,* J., it appeared that the plaintiffs were dealers in coal at Boston and Charlestown, and the defendant, a shipper of coals at Baltimore, and the owner of two mines, one called "Franklin," the other "George's Creek," both situate in Maryland, near the line of the Baltimore and Ohio Railroad,

two hundred miles or more from Baltimore; and that on April 6, 1864, the plaintiffs gave to the firm of Wallace & Moody who were the defendant's general agents at Boston, the following order, which the agents accepted : " Conditions for the sale and shipment of coal. No order at a limited rate of freight to be considered binding. No responsibility is assumed in procuring vessels, but every exertion will be made to engage them, without charge to purchaser. Contracts not transferable, except with consent of shipper in writing. Bills of lading, or other regular testimony of shipment, to be proof of delivery, both as regards time and quantity. Coal, when delivered on board of vessels, to be in all respects at the purchaser's risk. Each cargo of coal to be settled for, from time to time as delivered, in the mode specified in the contract. Captains of vessels sent by purchasers for their coal to bring written orders, and take each his regular turn in loading. All possible dispatch will be given in loading, but no claims will be allowed for demurrage, nor for the consequences of unavoidable delay. Every effort will be made for the fulfilment of this contract; but if prevented or obstructed by breaches, or other unavoidable occurrences on the canals or railroads, or at the mines, or by combinations, strikes or turnouts among the miners, boatmen or laborers, no claim for damages will be allowed. All coal delivered upon this contract, subject to advance or decline of tolls on the respective transportation companies, and all contracts to expire with the close of the shipping season in this year. Wallace & Moody, Agents. April 6, 1864.

" On the above terms and conditions, please deliver on board, at your wharves at Baltimore, cargo about 5000 tons, to be shipped to our wharves, eighteen feet of water. 5 000 tons, ' Franklin,' ' Run of Mine,' $6.00. This price also subject to any actual cost in advance of mining, through strikes, &c. Terms cash, or approved paper, at     months, interest added from date of bill of lading, or other proof of shipment. Oakman & Eldridge. Accepted, Wallace & Moody."

It further appeared that, by the usage of trade, the coal under this contract was to be delivered from time to time as pur-

chasers might need it, during the shipping season, which lasted to the end of the year; and that at different times the defendant shipped and the plaintiffs received under this contract several hundred tons.

The defendant claimed that he was prevented from delivering the remainder of the five thousand tons by breaches and other unavoidable occurrences on the railroad. There was evidence tending to show that the Baltimore and Ohio Railroad was interrupted for a short time by freshets in April, and that in the latter part of July there was a " serious interruption from the invasion of Maryland by the Southern armies under General Early," and that this interruption continued from about the 26th of July until late in the month of September. The defendant furnished a list of the product of his two mines during each month of the year 1864, the aggregate of which he gave as 62,720 tons; also, a list of his receipts of such coal, amounting in all to only 29,600 tons; and lists of his shipments of coal from each of these two mines, and of the sales of each for the Baltimore market; also, lists of contracts made by him for shipment during the year 1864, with prices, dates of sales, and amounts delivered under the contracts.

The judge charged the jury, among other matters, as follows:

" Both parties contemplated, as the evidence is on both sides, that this was to be a gradual delivery, substantially uniform, but varying a little, of course, as the opportunities varied for getting vessels, through the whole season.

" Now, to that understanding you are to apply, as matter of law, this clause (which is the principal one on which you have been addressed) in the contract: ' Every effort will be made for the fulfilment of this contract; but if prevented or obstructed by breaches, or other unavoidable occurrences on the canals or railroads, or at the mines, or by combinations, strikes or turnouts among the miners or laborers, no claim for damages will be allowed.' You are to apply that to the case of a man carrying on the coal business, in which the other contracting party does not expect him to perform the contract at once; would not be satisfied if he did, but expects it to be carried along through

the season. Therefore it will be for you to consider whether it would or would not be reasonable for him to make other contracts than simply this one. What, under that stipulation, would be the duty of the defendant, and what would be his rights? Would he have a right, in your judgment, under that state of facts, to make other contracts than the one with the plaintiffs? Why, how could he carry on his business otherwise? He is going to mine, we will say, 50,000 tons. The plaintiffs are to take 5000. They want that coal delivered along through the season as it comes. Is he not reasonable and right, in April, in making contracts with nine other persons for 5000 tons apiece, expecting to supply them all along? If, then, he has come down in the month of May 5000 tons of coal, is it or not a reasonable and proper performance of his contract, although he has enough to give the plaintiffs all their coal, if it was then sent off, for him to deliver 500 tons to the plaintiffs, and 500 tons to each of the nine others, thus disposing of five thousand tons of the whole product of the year? I can see no reason to doubt, gentlemen, that that would be right. And if he had customers at home, besides his contracts to deliver in dis tant cities; if he had men who kept little coal-yards in Balti more, who wanted 100 tons, or railroads or steamboats there, which he was accustomed to supply, would it be reasonable, and consistent with the intention of the parties and the scope of this contract, that he should supply these customers? — that is, that he should carry on his business just as he would if no other accident were to happen? I do not mean that he should be imprudent, and not keep a little ahead, as every prudent man, having contracts to fill, should do; but having made his arrangements to supply all his customers, and expecting that he would be able to supply them all, — if that was his mode of carrying on his business, until some interruption occurred from some source, I shall instruct you, as matter of law, that he would not be responsible to these plaintiffs, simply from the fact that he may have had on hand a quantity of coal sufficient to supply them with the whole 5000 tons, which he did not deliver to them, but delivered to somebody else. That is, that upon the proof

that it was not expected nor desired he should deliver it; that it was not intended by the parties; and is not the legal construction of this contract, that he was to suspend all his other business until he had performed his contract with the plaintiffs; and that the plaintiffs' contract was obviously left open to be performed in order with the rest of his business; and that if he continued to perform it reasonably, until some interruption occurred which is provided for in the contract, he would not be responsible, although he may have had coal enough on hand to discharge it.

" To come, then, to the question of the time when the Baltimore and Ohio Railroad was broken up by the troops of the rebels, and to the length of time that the depositions show you that state of things continued. I think it, as I have already stated in your hearing, a very doubtful question whether, upon the construction of this contract, if the effect of that interruption was so important, if it was so continuous, that it not merely prevented the receipt of coal by this defendant over the railroad while it lasted, but produced an important change in the value of coal in the market, for all purposes for the year; whether that would not have come within the conditions of the contract so far that it would have entirely exempted the defendant from any further liability, if he had chosen to abandon the contract on that ground. But, gentlemen, in order that you may decide the other questions in the case, without giving that instruction, and declining to give it as the defendant has asked, I will say so much as this to you upon that point: that if there occurred in the summer of that year a substantial interruption for three months of the railroad on which the defendant's coal must come from this Franklin mine, to be shipped at Baltimore, in order to be applied to the fulfilment of this contract; if that was an interruption to his business; if it impaired his capacity to keep, not only this contract, but all his other contracts, it would be, while it lasted, such an obstruction or prevention of the fulfilment of the contract as would defeat any claim for damages for its non-fulfilment during the time that that continued. And in regard to the coal which he had received before the obstruction,

if you should be satisfied, as claimed by the plaintiffs, that at the time of this obstruction, he had a certain number of thousand of tons on hand at his yard; if the regular supply on which he had depended for furnishing his customers in Baltimore, and his customers with whom he had made contracts elsewhere, was thus cut off, I do not think that he was bound to send the whole supply from his yard to his customers here, and leave himself to lose all his trade at home. I think that these conditions in regard to the interruption of the traffic would extend further than meaning simply to make it impossible for him to deliver coal enough to complete that particular contract, because it is not only ' preventing,' but ' obstructing.' Now, if his regular receipts of coal, on which both parties had understood he was to rely to furnish his contracts, were cut off for three months, I do not think he was bound to put himself into such a situation, by continuing to send it to one person, as to cut off other persons, with whom he had contracts, from their proportion, or to cut off the persons depending upon him for a supply in the ordinary way of his business at his yards from his supply there ; and that the language of the proviso is broad enough for that.

" On the other hand, the prayer for instructions that he was not at liberty to sell coal, and thereby to prevent his fulfilling his contract, is undoubtedly true to this extent : that he was bound, having made this contract, to proceed in good faith in its execution ; that he was not to avoid its execution because it would be more profitable for him to make some new arrangement by which he should escape from it. So that, if he had coal enough on hand to execute this contract, consistently with his other contracts and his domestic trade, so far as persons relied upon him for their stated supply, he had no right to sell that ، oal to a new customer, or to make a new contract with a person, merely because he could make it at a higher price. He had a right, on the one hand, to treat all the persons with whom he had made contracts in the spring which were to be performed along through the summer, equally and fairly, to give each of them an equal proportion of coal, under their contracts, as far as he was able. I think he had a right to carry on his home

trade at Baltimore, and supply the persons whom he was accustomed to supply, and to appropriate to that use the proportion of the coal which he received which he had been accustomed to appropriate in his business, and not to rely on that for the fulfilment of his contracts, but to consider any obstruction to the delivery of any more by the railroad as applicable in like proportion to those contracts as to anybody else, and no further. The defendant could not go a step beyond that, and undertake to sell anybody coal which he might have delivered under this contract, or under any other contracts which he had made, merely for the sake of making a profit upon it; and if he did that, you might find that he was violating his contract.

" Perhaps these remarks have not so much application to these months in summer, during the breach of the railroad. I think, however, they will enable you to determine, in the first place, whether the breach in the railroad did prevent his receiving his usual and customary supply ; secondly, whether he had on hand a stock of coal which would enable him to execute his contracts notwithstanding the failure of this supply, and to continue his business in the usual manner ; and if he had not, to what extent he had not ; and to the extent to which this constituted an interruption to his regular, stated supply, or incapacitated him to execute his contracts in the ordinary manner in which it was understood they should be, to that extent it will protect him from any liability."

In beginning his charge, the judge said : " You see, gentlemen, that the case is one involving, on the plaintiffs' claim, a very large amount of money. The plaintiffs made a contract, on certain conditions and limitations, for the delivery to them of these five thousand tons of coal. They made this contract in April 1864. If that contract had been performed to its full extent by the defendant, and no accident or fault had intervened, no conditions had applied which would exonerate the defendant, and he had not broken his contract in any particular, you see that by the subsequent advance of coals it would have been a very profitable matter to the plaintiffs. They may have lost the opportunity to put into their pockets a profit of somewhere from

fifteen to twenty thousand dollars, according to the testimony as they might have sold their coal sooner or later, as prices went up. It is undoubtedly a great disappointment to men to lose such an amount as that; and looking at it from the plaintiffs' side of the case, they having made a contract which they hoped would be obligatory and would bring the coal, and having made it in the hope of realizing some profit, when it turned out that, if performed, as they expected and intended it should be, it would have given them a very great profit, its non-fulfilment was undoubtedly a great disappointment to them, and they would be glad to get as much of that sum as the jury shall find they are entitled to."

After a verdict for the defendant, the presiding judge reported the case to the full court. His report closed thus : " The charge to the jury, and the rulings therein contained and appended to the same, are made a part of this report. If the rulings or instructions upon any point therein discussed or referred to were defective or erroneous; the verdict is to be set aside and a new trial had. Otherwise, judgment is to be on the verdict."

*S. J. Thomas,* for the plaintiffs.

*C. B. Goodrich & C. W. Huntington,* for the defendant.

WELLS, J. This is not a contract for the delivery of five thousand tons of coal absolutely ; nor one in regard to which the defence must stand upon the impossibility of performance. The plaintiffs' order for that quantity, accepted by the defendant, was based expressly upon the terms and conditions set forth in the proposal by which the defendant offered his coal for sale. The purport and effect of this proposal are to be ascertained from the writing, aided by the evidence of the usages of the business, the situation of the parties, and the relations which the business of the defendant, as seller at the place of delivery, bore to the business of working the mines and transporting the product to that place. It is thus manifest that the plaintiffs' order was given and accepted as one only among a great number of contracts of sale, by which the product of the mining operations of the defendant, during the " shipping season " of that year, was to be distributed to his several customers. It is also clearly ap

Oakman & another *v.* Boyce.

parent that the delivery was not intended to be made all at one time, nor at any precise times, nor upon mere demand; but from time to time, during the season, in accordance with the regular and usual course of the business, as the defendant carried it on. The arrangements in regard to the procuring of vessels, the order of loading in "regular turn," and the separate settlement for each cargo, accord with this interpretation of the contract. The contract itself being thus defined, the obligation of the defendant for its performance is modified by the stipulation that "every effort will be made for the fulfilment of this contract," and is further qualified and limited by the proviso, "but if prevented or obstructed by breaches or other unavoidable occurrences on the canals or railroads, or at the mines," there shall be no claim for damages. Such obstructions did occur, by the interruption of the means of transportation from the mines, for about two months in the latter part of summer There was evidence of some other causes of delay in the spring. The court ruled, favorably to the plaintiffs, that these obstructions did not relieve the defendant wholly from his obligation to deliver the coal to the plaintiffs, or from damages for any failure to deliver, whether before or after the interruption occurred; but that it relieved him only to the extent to which such failure was caused solely by the obstruction; that he was bound, notwithstanding the interruption, to use every effort to perform the contract in accordance with its terms, by the delivery of the coal. In determining whether the defendant had done this, the jury were instructed that they should take into consideration the entire business of the defendant; that the defendant was not bound to deliver to the plaintiffs the whole amount of their order to the exclusion of other customers; but that his obligation to the plaintiffs would be satisfied by delivery to them of such a proportion of his reduced means of supply as the amount of the order bore to the whole amount of sales; and that, in estimating the whole amount of the defendant's sales, the ordinary and usual amount of his home trade might be included. This is the substance of the instructions upon the most important part of the case; and we are all satisfied that the instructions were

correct and properly applicable to the peculiar character and circumstances of the case.

The jury were cautioned that this apportionment by the defendant should be made fairly and in entire good faith ; that he had no right to deprive the plaintiffs of their full proportion of the supply from the mines, for the sake of obtaining a larger price by sales to other parties, nor by new contracts or sales not in the course of his usual and ordinary business, after the cause of deficiency happened.

The instructions were very full, and seem to guard sufficiently against any misapprehension by the jury.   Upon this report we cannot go into the facts, to see whether they warranted the result to which the jury came.

We do not see that there is any reasonable ground for the complaint of the plaintiffs that, in stating the position of the case and of the parties, the presiding justice unfairly prejudiced the minds of the jury towards them, by representing their claim in the light of a gambling speculation.   The profit which the plaintiffs would have made upon the coal if it had been delivered, and their disappointment at not obtaining that profit, are mentioned as showing the importance of the case to them, and the light in which they must naturally regard it.   It is not suggested that it would be unfair or hard in them to take this profit, if the terms of their contract entitled them to it.   We do not think that the jury could have been led to form any improper bias from the remarks of the presiding justice upon this part of the case.                              *Exceptions overruled.*