# DAVISON CHEMICAL COMPANY

*vs.*

# BAUGH CHEMICAL COMPANY.

*Contracts: saving clauses for war, obstruction to navigation, etc.; increasing plant; pro-rating deliveries.*

Where a manufacturer assumes future commitments for his products to an amount which, when added to his existing commitments, exceeds the capacity of his plant, if he simultaneously undertakes additions to his plant, which should be sufficient to provide for the increased burdens assumed, the theory that if he does not deliver on such new contracts more than the actual product due to the new additions that then an original customer, who had contracts before those additions were made, would not be entitled to receive more than his proportionate share of the product of the original plant, is not the law.

pp. 28, 29

Where contracts for future deliveries have saving clauses for excuse on the ground of fire, accident, strikes, obstruction to navigation, war, insurrection or other uncontrollable causes, they may be relied upon as a defense, provided good faith was shown and the defendant is proved to be entitled to such protection.                                    pp. 28, 29

*Decided February 13th, 1919.*

Appeal from the Superior Court of Baltimore City. (DAW-KINS, J.)

The facts are stated in the opinion of the Court.

Following is defendant's third prayer, which the Court directed to be set out in the report of this case:

*Deft.'s 3rd Prayer.*—The jury are instructed that although the defendant made contracts with other parties than its regular customers, calling for future delivery of acid under such contracts in an amount which, when added to the deliv-

cries required during the same periods by its existing contracts, exceeded the amount which its plant as existing when such additional contracts were made might be expected to produce; yet if when such additional contracts were so assumed the defendant planned and undertook the construction of enlargements and additions to its plant, for the purpose of enabling it to manufacture the additional acid so contracted for, and if they further find that such enlargements and additions were made, and that though not completed as soon as anticipated, they did substantially increase the amount of acid produced by the defendant during such periods over what its production would have been if said enlargements and additions had not been made; that then the defendant was justified in appropriating for deliveries under such additional contracts such an amount of acid produced by it during such periods as did not exceed such part of its production as was due to such enlargements and additions, and appropriating for distribution among its regular customers under their contracts the remaining production of its plant; in the manner and to the extent set forth in defendant's second prayer.

If, therefore, the jury so find, and find that during the period involved in this suit, the defendant made deliveries to the plaintiff in amounts not less than the plaintiff's pro-rate portion of the acid available for delivery from defendant's plant during such period, exclusive of production due to such enlargements and additions, and excluding such additional contracts; and find that the insufficiency of such supply to provide for all deliveries required under defendant's contracts with its regular customers calling for deliveries during such periods, was due to such causes as are mentioned in defendant's first prayer, and that the amount of deliveries required by such contracts with its regular customers, during such period, was not in excess of what a reasonably prudent and skillful manufacturer of acid, at the time when such contracts were made, might reasonably have expected that the original plant would be adequate to produce, as explained in

defendant's second prayer; then their verdict must be for the defendant.  (*Refused.*)

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Harry N. Baetjer* and *Charles McHenry Howard* (with a brief by *Venable, Baetjer & Howard*), for the appellant.

*Frank R. Savidge* and *Joseph C. France* (with whom were *Lee S. Meyer* and *W. Irvine Cross* on the brief), for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a judgment obtained by the appellee against the appellant. On the 28th of April, 1913, a contract was entered into between the parties by which the appellee purchased from the appellant from 30,000 to 50,000 tons of clear sulphuric acid per year, delivered at the appellee's works at Canton, Md., or to Baugh & Sons Co., Norfolk, Va., from a period beginning January 1, 1913, and ending December 31, 1917. There was to be a minimum of 30,000 tons, or a maximum of 50,000 tons of 2,000 pounds each per annum, on a basis of 50° Beaume, 60° Fahrenheit, and the appellee agreed to declare on January 2nd of each year what proportion of the 20,000 tons option it would take that year. The price was $5.00 per ton of 2,000 pounds, delivered in storage tanks at the buyer's works at Canton, or storage tanks of Baugh & Sons Company, Norfolk, Va., in quantities not exceeding 700 tons at one delivery. Settlement was to be made in cash on the first day of the month for all deliveries made during the previous month, and deliveries were to be made as nearly as possible in equal weekly instalments. The contract contained the following clause:

> "*Fire, accident or strike, in the work of any of the parties herein mentioned, obstruction to navigation, accident to acid barges, war, insurrection or other uncontrollable causes, rendering buyers unable to receive*

*or sellers to deliver, shall be good and sufficient reason
to make this contract inoperative during the period of
necessary repairs, reconstruction or continuance of dif-
ficulties."*

A trial of the case resulted in a verdict in favor of the
plaintiff for $139,433.65. A motion for a new trial was
made, and the Court decided that it would grant a new trial
unless the plaintiff filed a remittitur of $10,922.77, and the
defendant would acceed to that. The plaintiff agreed to file
a remittitur, but the defendant declined to accede to the
terms. The Court overruled the motion and a judgment was
entered for the amount of the verdict. There are nine bills
of exception presenting the rulings of the Court on the admis-
sibility of evidence, and a tenth which embraced the rulings
on the prayers.

A case between these parties, involving this contract, was
decided by us at the April Term, 1918, and can be found
in 104 Atlantic, 404, and in 133 Maryland, page 203. That
was a bill for specific performance and an injunction, but
the period of time and the questions involved are not the
same in the two cases. At the trial of this case the plaintiff
offered five prayers, all of which except the third were
granted, and the defendant offered three, the first and second
of which were granted and the third rejected. A special
exception to the defendant's third prayer was also filed and
sustained. We do not understand the appellant to particu-
larly complain of the rulings on the plaintiff's prayers, and
we will therefore not discuss them in this opinion, but will
only say that we find no reversible error in the granting of
them or either of them. The alleged error in the rejection
of the defendant's third prayer is specially relied on, and we
will ask the reporter to copy that in his report of the case.
It is conceded that the authorities cited by the appellant in
support of the doctrine of pro-rating do not in terms deter-
mine the question which the appellant intended to present
by that prayer, but it is contended that it contains a propo-

sition "which logically follows from the general doctrine of pro-rating, as laid down in the authorities which we have cited; and that it is sound law." The cases cited are *Oakman* v. *Boyce,* 100 Mass. 477; *Garfield & Proctor Coal Co.* v. *Penn. Coal Co.,* 199 Mass. 22, 84 N. E. 1020; *Met. Coal Co.* v. *Billings,* 202 Mass. 457, 89 N. E. 115; *Jessup & Moore Paper Co.* v. *Piper,* 133 Fed. 108; *Consol. Coal Co.* v. *Mexico Co.,* 66 Mo. App. 296; *Luhrig Coal Co.* v. *Jones & Adams,* 141 Fed. 617; *McKeefrey* v. *Connellsville Co.,* 56 Fed. 212, and *Herman* v. *Bower Co.,* 242 Fed. 59. It is also claimed that the former case between these parties in 104 Atl. —, especially in the quotation from *Jessup & Moore Paper Co.* v. *Piper,* adopted the doctrine of pro-rating in such cases. But we have found no authority to sustain the position taken in the third prayer.

The theory of it, as stated in the appellant's brief, is that "When a manufacturer assumes future commitments for his product to an amount which, when added to existing future commitments to his customers, exceeds the existing capacity of his plant, but at the same time undertakes additions to his plant which should be sufficient to provide for the increased burden assumed," he is doing what a reasonably prudent man in the same situation would do. Or as stated elsewhere in that brief, "The appellant's third prayer was submitted on the theory that if a manufacturer, who has so made additions, does not deliver upon the new contracts assumed in reliance upon them more than the actual production due to such additions alone, and which the plant would not have produced if they had not been made, that then the plaintiff would not be entitled to more than his pro-rata share of the production due to the original plant alone, if distributed among those customers in like situation with itself."

We can understand why the doctrine of pro-rating should be adopted where the contracts for future deliveries have such saving clauses as that in this contract, which is quoted above. If the contract so provides, they are permitted to rely

on such things as that clause refers to—provided, of course, they act in good faith and are proven to be entitled to its protection, but unless the contract does so provide the parties must generally be held to the terms of it. There is danger, however, of giving these saving clauses too much latitude. This prayer must strike anyone as very unusual, and, to say the least, questionable. To permit a manufacturer to escape from his full liability to his regular customers *when he exceeded the amount which his plant might be expected to produce,* because he planned and undertook the construction of enlargements and additions to his plant, for the purpose of enabling him to manufacture the increased production or additional articles so contracted for, would be making contracts dependent upon contingencies and uncertainties which the law does not subject them to unless the parties have contracted with reference to them.

We need only recall the former case between these parties to illustrate how dangerous such a doctrine would be. There the defendant contended that it could not get sufficient quantities of pyrites in order to furnish its customers with the acid, and that, unless it changed its plant and furnished a much more expensive substitute, it could not supply it. If such condition existed, why should it be permitted to enlarge its plant to the detriment of its regular customers? Yet, according to the position appellant now takes, it could enlarge its production and is only responsible to its regular customers for the pro-rata proportion out of the product of the plant as it existed before it was enlarged. In other words it might have gotten sufficient pyrites to comply with its contracts with its regular customers, but by making a number of new contracts could not make sufficient acid because it used some of the pyrites which it ought to have used in the original plant. Of course we understand that the defendant does not mainly rely in this case on the difficulty in procuring pyrites, but it did in some of its letters refer to it, and we speak of it as a striking illustration of the danger of such a doctrine as the appellant contends for.

It may well be inferred from what is in the record that some of the troubles relied on by the appellant as a justification for pro-rating were not the sole causes for shortage in deliveries during the time the repairs were being made, and it would seem to be very probable that some of the shortage was owing to the overloading of the plant by reason of entering into the new contracts, which the appellant claims were to be filled with the increased production expected from the enlargements and additions to the plant. Mr. E. Wilbur Miller, president of the appellant, testified that on January 1, 1915, the capacity of the plant "was about 17,000 tons a month, 200,000 in round numbers, for the year." He said that in the early part of that year the fertilizer business was in bad shape, and gave that as a reason for going to the DuPont Company which he found wanted a large amount of high test acid, but in point of fact the table filed by the appellant for the year 1915 shows that for January, 1915, the commitments amounted to 17,234 and the deliveries to 16,271, for February the commitments were 17,049 and deliveries 14,544, for March the commitments were 17,577 and deliveries 18,212, and for April 17,300 commitments and 17,408 deliveries. The difference in February is about accounted for by the falling off of deliveries to the Baugh Company of over 2,400 tons. The evidence satisfactorily shows that that was owing to the Baugh Company shutting down that month for repairs, and that it was done with the consent of the appellant, which agreed to later make it up, and the parties finally agreed to 1,809 tons shortage as of October 1, 1915, which, Mr. Huntington, the vice-president of appellant, wrote on October 9, 1915, "will be made up to you at the earliest possible date." It would seem, therefore, that the testimony of Mr. Miller as to the falling off of the fertilizer business in the early part of 1915, being the reason he gave for seeking other contracts, was not borne out by his own company's figures, at least that that did not cause a decrease of deliveries on those contracts.

Mr. Miller testified that the demand for sulphuric acid began in April or May, and continued until the time he was testifying. As the agreed shortage in Baugh's deliveries was only 1,809 tons to October 1, 1915, it will be seen that the bulk of its shortage complained of occurred after the demand for sulphuric acid increased. In his letter of May 13, 1915, he wrote to the Baugh Company: "As the fertilizer condition has greatly improved, we would like to know whether you would be willing to let us make an additional offer for freight, and that you would stand by us to the extent of an additional cost on acid, not exceeding twenty-five (25c.) per ton. There is such an enormous demand for sulphuric acid because of the increase in ammunition manufacture, that we think it wise not to let all of the pyrites go in this direction." The Baugh Company at first declined to agree to that, but replied that "if you are forced to act in specific cases of bringing forward pyrites at an increased cost of freight and handling, we will be glad to have you take the matter up with us." On May 21, 1915, Mr. Miller wrote to Mr. Pinkerton, treasurer of the Baugh Company, that "If the fertilizer situation has not improved, as you say it has not done, the fertilizer people have no sane right to be in business. We would be very glad to offer you $1.00 per ton to be relieved of your contract for the next two years at least, and with such conditions existing all over the country it is about time for the fertilizer people to wake up and get some backbone. I can not and I will not pay one cent beyond our pyrites contracts to deliver acid under fertilizer contracts as they exist. Our contracts with the explosive manufacturers and general chemical trade have agreed to a clause that they will pay any additional cost in getting pyrites, whether foreign or domestic, and if we are unable to get this material they agree to have us burn brimstone, they paying the difference between our contract cost for pyrites and the cost of brimstone." In a letter dated December 29, 1915, addressed to some bankers, in a reply to a request for information regarding the company, Mr. Miller, the president, said that the company was

then producing 260,000 tons per year, and with the completion of an additional unit which would be in operation March, 1916, its output would be 300,000 tons per year. He said, "As a consequence of the European war, the Davison Chemical Company has open to it the opportunity either of selling its sulphuric acid at abnormally high prices, thus greatly swelling its profits, or of solidifying its legitimate business of supplying the needs of the local fertilizer manufacturers. It chose the latter course, and has made its deliveries on war contracts by increasing its capacity without interfering with its ordinary business * * *. The company had already, before the outbreak of the war, converted a number of its acid contracts into contracts for the delivery of the finished product, acid phosphate—an important step in the matter of extending the company's possibilities for profit." He also said that the company was then constructing a large acidulating plant, having a capacity of 300,000 tons of acid phosphate per annum, which would be completed by the midsummer of 1916; that "From the phosphate contracts already booked, which will consume but fifty per cent. of our total acid output, we should earn over $500,000 per year."

Other correspondence between the parties shows that with the exception of the month of February, 1915, which we have referred to above, the Baugh Company was constantly insisting upon acid being furnished according to its contract. There was, therefore, no occasion, at least as far as the Baugh Company was concerned, for the Davison Company to look for other contracts. What we have stated above reflects upon the attitude of that company towards its fertilizer customers, as those contracts existed, for when the president said they would not pay one cent beyond their pyrites contracts it manifested a willingness to violate its contracts with such customers, as if it could have obtained pyrites at a reasonable cost beyond what it had been paying for it, it was clearly its duty to do so. *Davison Co.* v. *Baugh Co.,* 104 At. 404. The reference to the contracts with the explosive manufacturers and general chemical trade was also significant. The reason-

able inference is that the company would take care of those contracts even at the expense of its former customers. Then the correspondence shows that the Davison Company was making acid phosphate and contemplated large profits out of the acidulating plant it was building. That would take sulphuric acid to fill its contracts for that article and would reduce its ability to supply such parties as the Baugh Company.

It was a great temptation to manufacturers who had sold their products up to or near the capacity of their plants before the abnormal prices for the manufacture of munitions and other things affected by the war to unload as many, or as much of their old contracts, as they could get rid of, and the different reasons appearing in the record which the defendant gave in attempting to excuse itself from furnishing the full amounts they were under the contracts under obligation to furnish are at least suggestive. But beyond all that, and probably more directly applicable to the question raised by this third prayer, is the fact that it would almost necessarily interfere with the former contracts to enter upon such construction work as the defendant undertook, at the time and under the circumstances it did, in order to supply acid under the new contracts, such as the record shows were made. It would certainly have a tendency to interfere with the repairs to the old plant and the evidence shows that the unexpected delays averaged four or five months. Such delays very seriously affected the old customers, as they occurred when there was an increased demand for their products. If there could be any doubt about the effect of it the letter of the president, dated October 21, 1915, shows that it did have such effect in this case. It is there said: "These repairs have taken very much longer to complete because of general construction conditions and also the unexpected demand for acid which *prompted us to try the plan of operation and reconstruction at the same time* (Italics ours). We have found this extremely costly and difficult and it would have been very much bet-

ter in the past had we closed down entirely for a month and gotten things in shape." If it had closed down for a month, and that had enabled them to make the repairs promptly and properly, the Baugh Company would have only had a shortage of 4,167 tons, if the accidents, breakdowns, etc., were the causes of the shortage complained of, instead of the much larger amount involved in this case. In point of fact, the troubles did not occur to all of the furnaces at the same time, but if the Davison Company could have made proper repairs by shutting down for a month ordinary business prudence and justice to the customers required that to be done.

What has been spoken of as the DuPont additions were in fact simply additions made by the Davison Company in part with money advanced by the DuPont Company on a contract it had with the Davison Company. Although the contract with the DuPont Company was not made until May 11, 1915, yet according to Mr. Ernest B. Miller, operating vice-president of the Davison Company, the construction of the additions was begun in March. Under the agreement the Davison Company was to deduct $2.00 a ton until the DuPont Company would be paid. But there is nothing in the DuPont contract, or any of those spoken of as "new contracts," so far as we have found, which provided that they were to be filled with the production from the additions made in 1915 or later. The parties were, under their contracts, as much entitled to have them filled out of the old as they were out of the new parts of the plant, and the old customers were entitled to have their contracts filled out of the new as well as the old plant, if that was necessary. Upon what principle a manufacturer could excuse his defaults if he could supply the article contracted for out of additions made to his plant after the contracts were made, but did not do so, we do not understand. We do not profess to be familiar with the construction of such plants as the appellant's, but Mr. Miller testified that all of the furnaces, "old and new went into a common tank." As we understand that, the acid

originally went into a tank common to all the furnaces. In short, there was no distinction made between the old and the new furnaces, the contracts did not refer to them, and at least in some cases the new customers were in part furnished out of the product of the old plant, and *vice versa.*

Mr. Huntingdon testified that during the month of September, 1915, there was little or no difficulty in supplying the customers with what they required, but in October or early in November the demands were greater than the production, which he claimed to be due to the troubles at the plant, and that hence it was necessary to pro-rate the production. But there were at least twelve contracts which were made from November 12, 1915, to February 25, 1916—although before that period they had commenced to pro-rate, and the additions were not completed. All of the new contracts called for higher prices than the Baugh Company was to pay—in some of them they were very much higher. A striking peculiarity is found in the letter of Mr. Huntington of January 20, 1916. He undertook at great length to excuse his company by "war conditions," and did not refer to any troubles at the plant, unless it was included in the general term, "other uncontrollable causes." If there had in fact been troubles to the extent testified to in this case, it was certainly remarkable that Mr. Huntington did not even mention them, but we have already prolonged this part of the opinion beyond what we intended, in the consideration of this prayer, and we will not refer to other things which the record discloses. For the reasons we have given and others which might be mentioned, we think that the third prayer was properly rejected. The other prayers of the defendant which were granted—especially the second—went as far as the appellant could ask. We will not discuss the special exception to the third prayer, because we are of opinion that regardless of that it was properly rejected.

We find no error in the rulings in the first, fourth and fifth exceptions. In the first the witness was asked: "I will

ask you whether you can testify as to whether or not you did not refuse to take 22.6% of your quota in 1912?" That was clearly inadmissible. It was during the period of a different contract and the conditions then might have been, and from what appears in the record were, wholly different from those existing in this case. If there was such refusal the allowance of the question might have resulted in spending time on an immaterial matter, explaining why there was such refusal, etc. In the fourth, the question was asked Mr. Miller, "Has it not been customary with your customers to avail themselves of that clause?"—referring to the clause in the contract above mentioned. Customers might or might not have availed themselves of it, if sufficient cause existed, but that could not throw any light on the question before the jury. In the fifth, the question was, "Had or had not the Baugh Company in the past taken its full quota, or had it under such clause taken only part in previous years?" What we have said above is a sufficient answer to that exception, as the conditions may have been altogether different. The question asked in the second exception was why the Baugh Company built a plant to make sulphuric acid and the witness said it was owing to a threat made by Mr. Miller that they were going to drive them out of business, and in the third he was asked to state the conversation with Mr. Miller. Those questions were admissible for several reasons. They reflected upon the question whether the defendant refused to furnish acid for the reasons it relied on, or whether it was not for other reasons. The sixth, seventh and eighth exceptions presented questions propounded to Mr. Rayfield, who was the manager of the fertilizing department of Swift & Co. In the sixth the question was: "It has been said here that the Davison Chemical Co. has built up on the good will of its past customers; has the Davison Company got the good will of the Swift Company?" We can not see the relevancy of that. In the seventh the question was, "During the period from May, 1915, to June, 1916, did the Davi-

son Company make full deliveries to you under your contract?" That was likewise clearly irrelevant. The question in the eighth was: "Did you make an examination of the Davison Chemical Co.'s plant between May, 1915, and June, 1916, for the purpose of satisfying yourself whether the contention made by them that they could not deliver acid in full on their contracts because of repairs or breakdowns for which they were not responsible, was correct?" Then added to that was, "As to your contract?" The question was thus finally limited to the contract of Swift & Co. It covered quite a period and for five months of that time the plaintiff and defendant had agreed upon what the shortage to the plaintiff was, and the defendant had promised to make it up. What might have satisfied Mr. Rayfield might not have satisfied the plaintiff, especially as Swift & Co. had apparently changed their contract to acid phosphate, while the plaintiff was entitled to acid, which was necessary in order to enable it to fill its contracts. Other witnesses of the defendant went into detail about the accidents, breakdowns, etc., and there can be no doubt about the fact that they occurred at times, and affected the production to some extent. The form of the question practically left to Mr. Rayfield to determine what the jury was to decide. He might have been asked to state facts showing the conditions he found, but unless he was there a great deal of the period he could not possibly have intelligently answered such a question, without relying on the records or statements of the defendant's officers or agents. The ruling of the Court certainly could not under the circumstances be held to be such error as to justify a reversal of the judgment. There was no error in the ruling in the ninth exception. The fact that a previous suit was dismissed can not affect this one—especially if it was dismissed because the plaintiff had not prayed a jury trial, as seems to have been the case.

It follows that the judgment must be affirmed.

*Judgment affirmed, the appellant to pay the costs above and below.*