BOEHME & RAUCH CO. *v.* LORIMER.

1. Sales—Contracts—Construction—Breach.

In an action for the breach of a contract whereby defendants, coal dealers, agreed to furnish plaintiff coal direct from a certain mine to meet its "entire requirements" for a period of nearly five years, estimated at from 40,000 to 50,000 tons per year, with the provision that defendants were not "to be held responsible for the failure to perform" due to "car shortages, strikes, lockouts, fires, acts of God and other causes beyond" their control, the causes excusing delivery must apply to the mining and shipment of coal from the mine, rather than to defendants personally or to their employees, since a strike among their employees would not have interfered with the shipment of coal from the mine.

2. Same—Customs and Usages—Pro-rating Coal Mined.

In view of the fact that plaintiff knew that its contract did not call for the entire output of the mine, the long-

continued practice, growing out of the necessities of the coal trade, of fairly distributing the coal produced, in case of a shortage, among those having contracts for its output, will be written into the contract.

3. SAME—APPLICATION OF PRO-RATING RULE.
The application of said rule permitting pro-rating is, however, dependent upon defendants' having in good faith contracted for sufficient coal to fill their contracts, and on the mining company's having an output equal to its commitments to defendants and all other contract customers.

4. SAME—TRIAL—INSTRUCTIONS AS TO RIGHT TO PRO-RATE.
Undisputed proof that defendants had contracted with the mining company for 25,000 tons per year more than they had contracted to sell, and that the mining company had made contracts for less than its normal annual output, entitled defendants to a peremptory instruction that at the times the mining company was prevented from performing because of lack of cars, labor difficulties, etc., the defendants had a right to pro-rate the coal allotted to them by the mining company in pro-rating its output among their contract customers.

5. SAME—PRO-RATING COAL MINED—CONTRACTS.
Where defendants' contract with the mining company called for coal largely in excess of their contracts for the sale thereof, it cannot be said, as a matter of law, that defendants had no right to enter into a contract with another party subsequent to their contract with plaintiff.

6. SAME—TRIAL—INSTRUCTIONS—FAIRNESS IN PRO-RATING.
Where there was evidence tending to show that the pro-rating was not at all times done fairly and with reference to commitments only, defendants were not entitled to a requested instruction that the evidence showed that plaintiff had received more than its pro-rata share.

7. SAME—TRIAL—INSTRUCTIONS—APPEAL AND ERROR.
Where the court made plain to the jury that defendants were under no obligation to furnish coal to plaintiff from any other mine than that with which they had contracted, it was not error to leave to the jury the question as to whether exchange arrangements between said mine and another across the river having different railroad connections affected to plaintiff's disadvantage the quantity of coal it received under the pro-rating system followed.

8. SAME—EVIDENCE—ADMISSIBILITY—FAIRNESS IN PRO-RATING.

Evidence that defendants, notwithstanding a zoning order of the government forbidding shipment of coal into Michigan, secured a large delivery of coal by boat to another contract customer in this State was admissible for its bearing upon the question of unfairness in pro-rating; and that it would have had to be reshipped was immaterial.

9. SAME—RIGHT TO PRO-RATE NOT DEPENDENT ON GOOD FAITH.

An instruction by the trial court the defendants' right to pro-rate depended upon their good faith was erroneous and misleading to the jury, since if conditions warranted pro-rating it needed not good faith to entitle defendants to resort to it.

10. SAME—CONTRACTS—BREACH—FAIRNESS IN PRO-RATING.

Failure to furnish plaintiff its fair share of the coal mined would. amount to a breach of the contract, in which case its damages must be restricted to the loss occasioned thereby.

Error to Wayne; Mandell (Henry A.), J. Submitted October 3, 1922. (Docket No. 6.) Decided December 29, 1922. Rehearing denied March 23, 1923.

Assumpsit by Boehme & Rauch Company against Andrew Lorimer and George Lorimer, copartners as John S. Lorimer's Sons, for breach of a contract for the sale of coal. Judgment for plaintiff. Defendants bring error. Reversed.

*McGregor & Bloomer* and *Francis L. Sward* (*Elliott G. Stevenson* and *Raymond K. Dykema,* of counsel), for appellants.

*Carl B. Grawn* (*James O. Murfin,* of counsel), for appellee.

SHARPE, J. On July 17, 1915, plaintiff and defendants entered into a written contract whereby defendants agreed to furnish plaintiff coal from the mines of the Boomer Coal & Coke Company in West Virginia

to meet its "entire requirements" for a period from its date to April 1, 1920, estimated at from 200,000 to 250,000 tons at "the rate of approximately 40,000 to 50,000 tons per year," at a price of 85 cents per ton at the mine. The agreement recited that the price was "based on the present wage scale in effect at the Boomer mines," and provided that—

"Should there be any increase or decrease in the cost of mining coal at the Boomer mines herein mentioned during the life hereof due to a change in said wage scale, or in any of the matters embraced therein, then the amount of such increase or decrease shall be added to, or deducted from, these prices, during the period in which such increase or decrease is effective."

The agreement also contained the following provision:

"All shipments made hereunder shall be well mined merchantable coal from the same mines and of equal preparation as test coal furnished. *Shipment and acceptance hereunder are subject to car shortages, strikes, lockouts, fires, acts of God and other causes beyond the control of either party, and neither party is to be held responsible for the failure to perform by reason of such matters.*"

The contract was fully performed during the first year. During the second year there was a shortage. Plaintiff repeatedly called defendants' attention to this. The market price of coal had greatly advanced. In a letter to defendants, written on November 29, 1916, plaintiff said:

"Now we know there is an awful incentive for producers of coal to lay down on 85c contracts when they can sell their coal for $3.50 to $4.50 per ton."

On March 30, 1917, it wrote defendants:

"We do not think you have any legal right, or moral right, to renew contracts when you are not taking care of your old ones."

All of defendants' contracts except that with plaintiff expired about July 1, 1917. On July 12th of that year they entered into a new contract with the Detroit United Railway to furnish it with its requirements for steam purposes at certain of its plants. The price fixed was $3.25 per ton for the period of 9 months after July 1st. It contained a similar clause to that in plaintiff's contract excusing delivery. A memorandum was attached to it, which defendants claim became a part of it, limiting the amount to be furnished to 92,000 tons. The shortage in delivery to plaintiff continued until January, 1919. Plaintiff purchased coal in the open market to keep its plant in operation. On May 24, 1919, it brought this action to recover the amount paid out by it over and above the contract price, in all $128,154.86. Defendants admitted the shortage, but claimed it was due to the "causes beyond their control" provided for in the contract. The jury found for plaintiff in the sum of $58,461.19. Defendants review the judgment entered thereon by writ of error.

1. Construction of the Contract. The causes which defendants allege prevented performance were shortages in cars, labor difficulties, and zoning, preferential and other governmental orders, issued during the war period. The rules of law governing contracts when the vendor agrees to sell and deliver products from the farm or forest or such as he may be able to purchase in the open market are not applicable. Plaintiff's officers knew that defendants did not own or operate the Boomer mine. They also knew that the normal production of the mine was largely in excess of the amount they were entitled to receive under their contract. They also knew that defendants had other contracts obligating them to furnish Boomer coal. Plaintiff's counsel conceded on the trial that it is impractical to store coal. Its production was therefore

dependent upon the ability of the mining company to secure labor to mine the coal and cars with which to make shipment. The coal was to be shipped direct to plaintiff from the mine.

Under the terms of the contract the defendants were not "to be held responsible for the failure to perform" due to "car shortages, strikes, lockouts, fires, acts of God and other causes beyond" their control. The causes above enumerated could not have affected defendants personally in their efforts to perform. No strike among defendants' employees could affect delivery to plaintiff. Neither could a car shortage do so unless it interfered with the shipment of coal from the mine. The conclusion seems inevitable that the causes excusing delivery must apply to the mining and shipment of the coal, and, if delivery to plaintiff was prevented thereby, the defendants are not liable for damages on account thereof unless such liability arose out of the manner of distribution by the defendants or the mining company. Bearing in mind plaintiff's knowledge of the fact that its contract did not call for the entire output of the mine, we think it may fairly be said to have been within the contemplation of the parties that the amount produced should be fairly distributed by the mining company among those having contracts to purchase its output. If, however, such construction cannot be placed on the language of the contract, the undisputed evidence of such a custom would, we think, be controlling. The long-continued practice, testified to, would seem to grow out of the necessities of the coal trade. Otherwise, producers would be unable to enter into contracts to supply coal and their dealings would be restricted to sales when the coal was actually mined and loaded in cars for delivery. In view of the magnitude of the coal industry, such a manner of handling it would be impossible.

"In contemplation of law the custom is written into the contract."

*Luhrig Coal Co.* v. *Jones & Adams Co.*, 141 Fed. 617. See, also, *Consolidation Coal Co.* v. *Peninsular Portland Cement Co.*, 272 Fed. 625; *McKeefrey* v. *Coke & Iron Co.*, 56 Fed. 212; *Oakman* v. *Boyce*, 100 Mass. 477; *Garfield & Proctor Coal Co.* v. *Pennsylvania Coal & Coke Co.*, 199 Mass. 22 (84 N. E. 1020); *American Fuel Co.* v. *Interstate Fuel Agency*, 261 Fed. 120; *Atlantic Steel Co.* v. *Campbell Coal Co.*, 262 Fed. 555; *DeGrasse Paper Co.* v. *Coal Co.*, 190 App. Div. 227 (179 N. Y. Supp. 788); *Eaton* v. *Coal & Mining Co.*, 161 Mo. App. 30 (142 S. W. 1107); *Consolidated Coal Co.* v. *Jones & Adams Co.*, 232 Ill. 326 (83 N. E. 851); *Cottrell* v. *Smokeless Fuel Co.*, 78 C. C. A. 366, 148 Fed. 594 (9 L. R. A. [N. S.] 1187).

The application of the rule permitting pro-rating was, however, dependent upon the defendants' having in good faith contracted for sufficient coal to fill their contracts and on the mining company's having an output equal to its commitments to defendants and all its other contract customers. It seems undisputed on the record that defendants' contracts (that with plaintiff and that with the Detroit United Railway) called for less than 200,000 tons per year. Their contract with the mining company entitled them to a minimum of 225,000 tons. It also may be said to be undisputed on the record that the entire commitments of the mining company were much less than it had a right to reasonably expect its annual output to be, had it been permitted to operate and deliver without interruptions beyond its control. These facts being undisputed, defendants were entitled to a peremptory instruction that at the times they were prevented from performing because of lack of cars, labor difficulties, and governmental interference due to the war, the mining company had a right to pro-rate its output among its several contract customers and the defend-

ants had a right to pro-rate the coal allotted to it by the mining company between its contract customers.

2. The Contract with the Detroit United Railway. The fact that defendants were large dealers in coal was well known to plaintiff. While defendants were under a legal obligation to furnish plaintiff coal as provided for in the contract, we do not think it can be said as a matter of law that they had no right to enter into the contract with the Detroit United Railway. They at that time had a written contract with Hanna & Company, representing the mining company, to supply their customers with a minimum amount of 225,000 tons per year. This was largely in excess of the maximum contained in both these contracts. The defendants listed its contract requirements with the mining company. These and all other contracts for the sale of the product of its mine constituted the basis on which the percentage available for distribution was arrived at. Had not the contract with the Detroit United Railway been made, we are impressed that plaintiff would not, under the plan of pro-rating adopted, have received any considerable quantity of coal more than it did receive. Had the defendants' commitment been but the amount of plaintiff's contract, the mining company would doubtless have taken on other contracts to equal its reasonable minimum production.

3. Did Plaintiff Receive its full Share of the Coal Produced?

Defendants asked the court to charge that:

"The evidence which remained uncontradicted, established that plaintiff received, during the entire time when causes beyond control were so interfering with production and shipments as to cause a shortage, more than its said percentage or pro rata share."

We do not think such a charge would have been justified under the proofs. Several conferences were

held in July, 1917, between Judge Lockwood, representing plaintiff, and defendants looking to plaintiff's getting a larger supply of coal. On July 30th, defendants wrote plaintiff:

"Referring to the conversation with you on the 19th inst. we understand that if, under our contract with you, during the period from July 1, 1917, to May 1, 1918, we are able to supply all the coal you order for your requirements up to the maximum monthly tonnage provided by the contract: viz: 4,166 tons monthly, it is your intention, on May 1, 1918, to pay us the additional cost of production at the Boomer mines this year, as compared to a year ago, on all tonnage supplied between the dates named. The additional cost of producing coal at the Boomer mines this year as compared to a year ago, is, according to the figures shown me, 50c per ton. Of this amount, you are now paying an amount per ton equal to the two advances granted the miners; one of 13c per ton, on April 1, 1917; and the other, 10c per ton on July 1, 1917, leaving 27c per ton, which we understand it is your intention to pay us, under the conditions named above.

"It is specifically understood and agreed that our knowledge of your intention, as above expressed, does not in any way act to alter or change any of the terms or provisions of the contract."

To this plaintiff replied on August 3d:

"Yours of July 30th received. We confirm the conversation to which you refer as follows:

"If you supply from week to week from July 1, 1917, to May 1, 1918, the coal required at our plant, not to exceed 961½ tons average per week, we will voluntarily pay to you on May 1, 1918, the difference between what we shall have paid you therefor from month to month and one dollar and forty cents per ton. This will give you $1.40 per ton for the coal delivered between these dates providing you keep us supplied with coal. It is understood and agreed that this is a voluntary payment to be made by us and that the contract existing for coal is not, and shall not be,

in any manner altered or changed by reason of anything contained herein or done hereinunder."

Of the additional 50 cents which plaintiff promised to pay, 23 cents was due to advances granted the miners and within the terms of the contract; 27 cents was simply a bonus to be paid on condition that plaintiff received more coal than it would receive unless such payment was made. We think these letters tend to show that the pro-rating was not at all times done fairly and with reference to commitments only. It is the claim of defendants that the entire production of the Boomer mine was committed under contracts with defendants and others and that the output was fairly pro-rated among such contract purchasers. If so, in what way could defendants procure an additional supply of Boomer coal for plaintiff on condition that it paid the extra 27 cents per ton therefor? Andrew Lorimer was interrogated concerning these letters. He testified:

"We expressed a hope to Boehme & Rauch that they would pay more, but we did not tell them if they paid more that it would encourage shipments to them."

We can see no other purpose in securing their consent to make the additional payment than a hope, at least, that they would thereby get more coal. The fact appears, however, that in the succeeding month, August, 1917, plaintiff received 4,053.60 tons of Boomer coal, a larger amount than in any month between July, 1916, and January, 1919, except the month of December, 1918.

The pro-rating at the mine was on the basis of the customers' commitments. Hal H. Booth, manager of the bituminous sales department for Hanna & Company, testified:

"Of the 419,000 tons of coal we mined in 1917-1918, 25,831 tons was shipped to Boehme & Rauch.  *   *   *

"The Boomer mine, according to the records, shipped 66½ per cent. of their commitments.        Therefore, Boehme & Rauch were entitled to 66½ per cent. of the commitment to them.        Sixty-six and a half per cent. of 3,100 tons shown in the commitment to Boehme & Rauch is 2,061 tons due them for the month of July."

This testimony is in conflict with the tabulated statement from the Boomer company's books put in evidence by defendants (Exhibit 31) wherein the total commitment to plaintiff from July, 1917, to July, 1918, is stated to be 3,400 tons per month.        It also appears from the same exhibit that the commitment to plaintiff for the year, July, 1916, to July, 1917, was 37,510 tons.        It was doubtless on this sum that Mr. Booth's computation was made.        We cannot understand why, in view of the contract, the commitment to plaintiff should have been listed by the defendants with the mining company at less than 40,000 tons for the year.

There is proof that "spot sales" (sales to other than contract customers) were made by defendants in 1916 and 1918.        Counsel insist that even if such sales were made—

"it would make no difference, because in fixing the prorating percentage *no credit was taken by Lorimer for these* outside sales."

If, however, the shipments were made by the mining company at defendants' request and credit was taken for them by the mining company in fixing the prorating percentage to which defendants' contract customers were entitled, such sales would directly affect the quantity of coal which plaintiff received.        These facts, and we do not say there are not others, clearly presented an issue on this question for the jury.

4. Paint Creek Coal.        The Paint Creek Coal Company was organized in 1916 by individuals interested in the Boomer company.        Its mines and those of the Boomer company were on opposite sides of a river

and served by different railroads. The Paint Creek company had no contracts and sold its product at current market prices. Coal was frequently exchanged by the Paint Creek company's shipping to Boomer customers and the Boomer company's filling orders given the Paint Creek company. Defendants, assuming that the testimony relating to the dealings between the two companies had no bearing on any issue presented, in a lengthy request asked that the jury be instructed that all such evidence was immaterial. The trial court made it plain to the jury that the defendants were under no obligation to furnish the plaintiff with Paint Creek coal in the fulfillment of their contract. He, however, left it to the jury to find whether the arrangement for exchange made and followed by these companies affected the quantity of coal which the Boomer company distributed among its customers to the disadvantage of plaintiff under the pro-rating system which was followed. In this we think no error was committed.

5. 15,000-ton shipment to the Detroit United Railway. It appears that while an order of the United States fuel administrator was in force, prohibiting the shipment of coal into Michigan, 15,000 tons of Boomer coal were shipped by boat to the Detroit United Railway at Detroit. This shipment was applied on defendants' contract with that company. This proof was received over defendants' objection and a specific request was presented asking that the jury be instructed not to consider it. We think this evidence was material and might be considered by the jury in its bearing upon the question of unfairness in pro-rating. If defendants were able, notwithstanding the zoning order, to secure a delivery of Boomer coal in Detroit, it was their duty under their contract with plaintiff to furnish it with its proportionate share thereof. That it would have to

have been reshipped would not, in the absence of other obstacles, relieve defendants from doing so.

6. Instructions to the jury. It remains to consider defendants' assignments based on the charge of the court and the failure to give certain of defendants' requests.    The jury were instructed:

"The defendants were dealers in coal, and were known to the plaintiff to be selling coal directly from mines; and as the contract under consideration called for coal from a particular mine, the Boomer mine, and because the contract provided that the contract was subject to—and I quote from the contract—'car shortage, strikes, lockouts, acts of God, and other cause beyond the control'—of the defendants, they claim that they found themselves unable to fulfill all their contract obligations as to the amounts of coal to be furnished, and that in such event they claim that they would be justified in law, because of the custom sworn to in evidence here, in pro-rating the available supply among their contract customers, provided, always they acted in good faith in their transactions.   In that connection I will say that the defendants' right to pro-rate shipments depends particularly upon their exercise of good faith and reasonable care to avoid taking contracts in such amount as it might reasonably expect would interfere with its securing sufficient cars to fill the plaintiff's contract; upon the making of an honest effort and the use of reasonable diligence to secure sufficient cars to fill the contract; and upon its distribution of cars, which it actually did get, among its different customers, so that the plaintiff would receive its fair share.   Car distribution in case of shortage calls for good faith, diligence, prudence and reasonable care in the respects mentioned.   The good faith asserted here and denied here, becomes the controlling issue, but good faith, although a controlling attribute, becomes here a disputed fact.   Unlike facts as ordinarily considered, it cannot be produced directly, but its existence is left largely to proof of other facts, and to inference from established facts.   If one acts honestly, and with the amount of care, prudence and caution that an ordinarily prudent man would give

under like circumstances, then it might truly be said that good faith is shown.   *   *   *

"The question of good faith in defendants' transaction is of paramount importance, because good faith alone would justify pro-rating. And second, pro-rating when justified, must be done in perfect good faith.   *   *   *

"In considering this case, you must ascertain and determine, not what was the indirect or remote cause of the shortage in deliveries, but what was the proximate cause. If deliveries were short, due to causes beyond the control of the defendants, in so far as these causes excuse the failure, they are exonerated from delivering, and only in so far.   *   *   *

"Strictly speaking, you should examine each month in controversy to ascertain and determine whether or not there was any shortage in that month, and what the proximate cause of the shortage was and the damages, if you find any, that were sustained by the plaintiff in each case."

Defendants' counsel say:

"The trial court held a mistaken view of this case throughout. He considered that the situation demanded good faith and applied that idea to the entire case to the exclusion of any definition of the legal obligations which flowed from the contract, and to the exclusion of any definition of the legal method of pro-rating."

The insistence of plaintiff's counsel that no right to pro-rate existed we think caused the court to be over-cautious in presenting the law applicable in this respect to the jury. The questions to be passed upon by them were intricate and not easily understood by the lay mind. We are impressed that under the charge as given they would necessarily fail to grasp the legal effect of defendants' right to pro-rate. The law giving them such right became a part of the contract just as though it had been written therein. If conditions justified pro-rating, it needed not "good faith" to entitle defendants to resort to it. The proofs

221—Mich.—25.

must, of course, show an inability on the part of defendants to perform for causes stipulated in the contract, relieving them from doing so.   When such causes were shown to exist, and there can be no question but that they were here shown as to a part of the time, the question follows, Was the pro-rating fairly done?    If not, then to what extent was plaintiff damaged thereby?    The rule of determination is well stated by Judge Knappen in *Consolidation Coal Co.* v. *Peninsular Portland Cement Co., supra:*

"Again, while failure to exercise good faith, prudence, diligence and reasonable care should forfeit relief to defendant to the extent that such failure has prejudiced plaintiff, we think that right to relief should not thereby be entirely forfeited, but should be lost only to the extent to which plaintiff has been thereby prejudiced.    As said in *Metropolitan Coal Co.* v. *Billings,* 202 Mass. 457, 462 (89 N. E. 115) :

"'If it (plaintiff) had delivered to the defendant his proportion of existing and available supplies, then it was excused by the strike from any further performance of the contract. If it had not delivered to the defendant his due proportion, then to the extent to which the defendant had been damaged by such failure it was liable and the defendant could recover.' "

The burden of proof was on defendants to show that pro-rating was justified by causes beyond their control and that plaintiff had been furnished with its share of the coal mined under the plan adopted for distribution.   The exercise of the right to pro-rate would not be a breach of the contract.   A failure to furnish plaintiff its fair share of the coal mined would amount to a breach.   In that event, plaintiff's damages must be restricted to the loss occasioned thereby.   The amount of such loss must be established by competent proof from which it can be ascertained, or at least fairly estimated.   The usual rules relative to such breaches will be applied.   The jury must not be permitted to speculate concerning the damages or to award

a sum, not based on proof, which they might think to be just and reasonable.

We have not assumed to consider the assignments of error in the order discussed by counsel. In view of a new trial, we have attempted to discuss and decide such questions of law as we hope may aid both court and counsel on a retrial in submitting the case to the jury without error.

The judgment is reversed and a new trial granted, with costs to defendants.

FELLOWS, C. J., and WIEST, MCDONALD, CLARK, BIRD. and STEERE, JJ., concurred. MOORE, J., did not sit.