## HALEY v. VAN LIEROP.
### Civil Action No. 446.

District Court, W. D. Michigan, S. D.
April 27, 1945.

Fox, Fox & Fox, of Kalamazoo, Mich., for plaintiff.

Stearns, Sharpe & Stapleton, of Kalamazoo, Mich., for defendant.

RAYMOND, District Judge.

Findings of Fact.

1. Plaintiff is a resident of Sarasota, Florida; defendant is a resident of Hartford, Michigan; and the amount involved is in excess of $3000, exclusive of interest and costs.

2. Both of the parties are now and for several years past have been engaged in the business of growing and marketing gladiolus bulbs.

3. Plaintiff seeks to recover $38,235 for damages resulting from alleged lost profits because of the failure of defendant to deliver 525,000 gladiolus bulbs of a total of 1,300,000, orders for which (Exhibits 1 and 2) were accepted by defendant on November 3, 1943 and November 23, 1943 (Exhibits 3 and 4). Defendant denies liability and seeks to recover a balance of $1,-125, for the purchase price of bulbs delivered to plaintiff, for which payment has admittedly not been made.

4. Because of variant extremes of weather conditions as to precipitation and temperature, and because of diseases to which gladiolus bulbs are subject, great uncertainty accompanies the growing and marketing of gladiolus bulbs, and the hazards of the business are well known to those experienced and engaged in such production. Estimates of future crops of marketable bulbs are recognized as highly speculative until after digging, cleaning and sorting have been completed.

5. Each of the two orders here involved contained the words "Advance orders subject to crop." These words, in accordance with custom and usage in the gladiolus bulb industry, are construed as recognizing the possibility of crop failure resulting from the hazards in the industry.

6. In October, 1943, Hubert M. Slegers, a purchasing agent of plaintiff, came from Florida for the purpose of purchasing bulbs from defendant for plaintiff. He remained for several days, and, on October 30, 1943, placed the orders known herein as Exhibits 1 and 2. During his stay, he inspected the defendant's fields near Hartford, Michigan, and inspected for disease and rot the crop which was then in process of being harvested. He was informed with reference to certain lands leased by defendant in Indiana on which defendant was also producing gladiolus bulbs.

7. The order of October 30, 1943 (Exhibit 1) (which was accepted by defendant on November 3, 1943 Exhibit B), was for 400,000 gladiolus bulbs. On the same day, a tentative order (Exhibit 2) for an additional quantity of such bulbs was placed by said agent Slegers. This tentative order was followed by correspondence between the parties, ending in a definite order from plaintiff for 900,000 additional bulbs, and acceptance thereof by defendant. Both orders were "advance orders" and were expressly made "subject to crop."

8. The contract of sale which resulted from the orders and correspondence, when construed in the light of the surrounding circumstances, brings the conclusion that these transactions were with defendant as a grower and not as a dealer, and also that the parties contemplated that plaintiff's orders would be filled from the crop grown either upon defendant's own land or upon the land under lease by him in Indiana.

9. The varieties and sizes of the bulbs covered by these agreements are specified therein. The quantity of available bulbs after sorting suitable to meet these agreements could not be determined with reasonable certainty prior to January 15, 1944. Prior to that time, defendant had contracted for delivery covering a total (including those ordered by plaintiff) of 6,775,000 bulbs of the same general varieties and sizes. The total of bulbs called for by these contracts as made by defendant did not exceed the normal expectancy from the plantings of defendant.

10. Due to weather conditions, disease and other causes over which defendant had no control, the actual crop of bulbs for the 1943–44 season here in question was much below normal. Generally, among gladiolus bulb growers, the crop was about 50% of normal. Production from the plantings of defendant was considerably below 50% of normal.

11. Defendant attempted to supplement his own production of bulbs by substantial outside purchases. Upon these outside orders he actually received deliveries of something less than 50%.

12. Defendant shipped on his contracts for sale all of the bulbs of the required sizes, varieties and qualities which he had available, both from his own growings and from his outside purchases.

13. The total of shipments of the varieties and sizes here in question was 3,063,565 or an average of 45.3% on the contracted total of 6,775,000.

14. Defendant shipped to plaintiff a total of 775,000 bulbs. This amounted to 59.6% of plaintiff's orders, and left a shortage of 525,000 bulbs on such orders.

15. The conditions which existed, including the specific provision found in plaintiff's contracts, "Advance orders subject to crop," and including the abnormal crop shortage, were such as to justify defendant in prorating on his various contracts with other bona fide customers, the bulbs which he had available therefor, provided said prorating was accomplished fairly and equitably and in such a manner as to result in no profit to defendant.

16. Among defendant's customers, other than plaintiff, were Frank Brothers, which was a partnership of which Walter Frank and defendant were sole members. Their partnership agreement recited that this was "a partnership for the production, management, sale and control of gladioli bulbs and flowers at a gladioli farm near Arcadia, Florida". The partnership contract was dated September 21, 1943; it required defendant to furnish to it approximately 1,000,000 gladiolus bulbs, the partners to share equally in ultimate profits.

17. Also among defendants customers, other than plaintiff, was one Verdonschot, an employee of defendant. On November 6, 1943, defendant entered into a contract with said Verdonschot whereby defendant agreed to furnish Verdonschot approximately 1,000,000 gladiolus bulbs. Under the terms of that contract, Verdonschot had charge of the growing of said bulbs for defendant, receiving only a salary and a commission for his services. Such profits as might arise from this transaction belonged to defendant.

18. Because of defendant's relations with Frank Brothers and Verdonschot, defendant was not justified in including in prorating of his production and purchases the orders of 1,000,000 each in dealing with these parties. In so doing, he was dealing with himself for the purpose of realizing a profit. Such prorating was therefore inequitable and does not excuse performance by defendant.

19. Eliminating the 2,000,000 bulbs contracted for with Frank Brothers and Verdonschot, the total of bulbs contracted by defendant from his 1943 crop was 4,775,000. Plaintiff's orders constituted 27.2% of this total. Of the total shipments of 3,063,565, plaintiff was entitled to receive 27.2%, or 833,290 bulbs. He actually received 775,000, leaving a shortage on a pro rata basis of 58,290.

20. The record discloses that the 58,290 bulbs which should have been but were not delivered to plaintiff on the pro rata basis, would have produced approximately 3886 dozen of cut flowers at an average market price, at the time, of $1 per dozen. The plaintiff would also have had at the end of the growing season from these bulbs, approximately 58,290 bulbs with a market value of $25 per thousand. The bulbs would also have produced bulblets which would have had a market value of about $388.70. From the foregoing items should be deducted $450 the approximate cost of growing, cutting and handling, and $900, the approximate cost of the 58,290 bulbs which were undelivered.

21. A fair accounting between the parties is as follows:

| | |
|---|---|
| For cut flowers which would have been produced from the 58,290 bulbs, which defendant failed to deliver on an equitable pro rata basis, 3886 dozen @ $1 per dozen .............. | $3886.00 |
| For value of 58,290 bulbs at end of growing season, at a market value of $25 per thousand.... | 1457.25 |
| Market value of bulblets which would have been produced.... | 388.70 |
| Total gross value of cut flowers, bulbs, bulblets .............. | 5731.95 |
| Approximate cost of growing, handling and cutting ............. $450.00 | |
| Approximate cost of 58,290 bulbs .......... 900.00 | $1350.00 |
| Amount to which plaintiff is entitled for lost profits on undelivered bulbs ............... | $4381.95 |
| Amount due defendant from plaintiff for bulbs admittedly not paid for ................ | $1125.00 |
| Amount for which plaintiff is entitled to judgment ......... | $3256.95 |

### Conclusions of Law.

1. The court has jurisdiction of the subject matter and of the parties.

2. The contracts between plaintiff and defendant involved the sale of a future crop of gladiolus bulbs which in law constituted a sale of specific property.

■ 3. Interpretation of the contracts here involved necessarily requires consideration of the surrounding circumstances, and trade usages. The general intention of the parties must be subserved. Words may not be rejected as mere surplusage if any reasonable purpose thereof can be gathered from the whole instrument, and technical words are to be interpreted as usually understood by persons in the business to which they relate. When members of a trade employ trade terms, they attach to them their trade significance. See 46 Am.Jur., Sales, sec. 284; 12 Am. Jur., Contracts, secs. 237, 241, 245, 247.

■ 4. Under the contract and under the rules of law independent of the contract, the non-existence (without fault of the promisor) of the subject matter of a sale of this nature excuses performance, either in whole or in part, as the case may be. See 12 Am.Jur., Contracts, sec. 374; 46 Am.Jur., Sales, sec. 236; 12 A.L.R. 1288; Snipes Mountain Co. v. Benz Brothers & Co., 162 Wash 334, 298 P. 714, 74 A.L.R. 1287, Note 1289, 1294.

■ 5. The parties contemplated that the bulbs which were the subject of the sale and purchase under the orders here involved would be produced from the lands owned or controlled by the defendant, and it was not contemplated that defendant should make up shortages in production by purchases on the open market.

■ 6. A grower is entitled as a matter of law to anticipate normal production from his plantings and to make advance contracts in anticipation of that production. In cases where such contracts are made in good faith and normally expected production fails for causes beyond the control of the grower, he is protected against liability for damages, provided he makes just and equitable distribution of the crop actually produced, pro rata, among the contracting parties. See 74 A.L.R. 995, Note; Consolidation Coal Co. v. Peninsular Portland Cement Co., 6 Cir., 272 F. 625; Boehme & Rauch Co. v. Lorimer, 221 Mich. 372, 191 N.W. 8.

■ 7. The contracts which are entitled to such pro rata consideration are determined as of the date when the existence of shortage is either actually discovered or should have been discovered in the exercise of reasonable diligence.

■ 8. In event of unfair or inequitable pro rata distribution, the purchaser is entitled to recover as damages such losses in profits as are shown with reasonable certainty to be the natural and probable consequence of the default of the seller.

■ 9. Plaintiff is entitled to recover from defendant the sum of $3256.95, and judgment will be entered accordingly.