REX OIL & GAS COMPANY *v.* BUSK.

1. MINES AND MINERALS—OIL AND GAS—DRILLING AGREEMENTS—TERMINATION OF OPTION TO PURCHASE OIL—CUSTOMS AND USAGES—EVIDENCE.

Uncorroborated evidence of defendant in support of his claim that option to purchase oil from wells in designated areas, made incident to oil-well drilling agreement as to one well, was terminated in the event such drilling operations resulted in a dry hole *held,* too indefinite and insufficient to permit claimed custom of the trade as to termination of such options to be read into agreement under consideration.

2. SAME—OPTION TO PURCHASE OIL—TIME—EXPIRATION OF OPTION.

Rights under an option to purchase oil produced on any property leased by defendant producer in a general area must be exercised within a reasonable time, the extent of which must be determined in the light of the circumstances of the case, as it cannot be presumed that the parties intended the holder of the option should have an indefinite and perpetual right to purchase oil produced in such area, where the option is silent as to its duration.

3. SPECIFIC PERFORMANCE—MATTER OF GRACE.

Specific performance is a matter of grace and not of right, the granting of such remedy depending upon the peculiar circumstances of each case.

4. SAME—EQUITY.

Specific performance may not be arbitrarily refused as the court is controlled by settled equitable principles.

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 5] Generally as to sale of oil by lessee, see 24 Am Jur, Gas and Oil § 124 *et seq.*

[2] Generally as to exercise of option to purchase, see 46 Am Jur, Sales § 58.

[3–5] 49 Am Jur, Specific Performance §§ 8, 9.

[5] 49 Am Jur, Specific Performance § 73 *et seq.*

5. Same—Time—Option to Purchase Oil.

Denial of specific performance of option to purchase oil from wells in designated areas, made incident to oil-well drilling agreement as to well which turned out to be a dry hole, without prejudice as to a proper action at law, was not an abuse of discretion, where such option was not exercised for upwards of 20 months after the exploratory operations had proved unsuccessful and after defendant had acquired new capital from other sources to drill new wells on lands covered by plaintiff's agreement.

Appeal from Newaygo; Pugsley (Earl C.), J. Submitted April 15, 1952. (Docket No. 39, Calendar No. 45,419.) Decided January 5, 1953. Rehearing denied March 10, 1953.

Bill by Rex Oil & Gas Company, a Michigan corporation, against Augie Busk for specific performance of option. Decree for defendant without prejudice to action at law. Plaintiff appeals. Modified and affirmed.

*Street & Sorensen,* for plaintiff.

*Alexander, Cholette, Buchanan, Perkins & Conklin* (*Stanley Cheff,* of counsel), for defendant.

Bushnell, J.   Plaintiff Rex Oil & Gas Company held an oil and gas lease on 37 acres in section 20 of Croton township, Newaygo county, and other leases on lands in the immediate area. Rex produces and buys oil which it sells to refineries. Defendant Augie Busk, also a producer, had leases in the area. Desirous of exploring for oil the parties entered into a contract dated December 9, 1949, which provides that Busk would drill on the Rex lease in section 20 and furnish full geological and drilling information. He was required to commence operations within 30 days and continue with due diligence to a certain depth. Upon completion of the well,

Rex agreed to assign its lease to Busk, reserving, however, the optional right to purchase any or all of the oil and gas which might be produced. Such an option to buy crude oil, to the exclusion of all other buyers, is in common usage among oil men and is designated as a "call." If the well proved to be a "dry hole," Rex was obligated to pay Busk $1,000 as partial reimbursement for his expenditures.

The controversial portion of the contract reads as follows:

"10. Busk does hereby grant to Rex the optional right to purchase any or all of the oil which might be produced under leases on property described as follows: E1/2 of NW 1/4 Sec. 29, T12N, R11W, Croton Twp., Newaygo county; SE 1/4 of NW 1/4, Sec. 6, T16N, R17W, Weare Twp., Oceana county, and any other property on which Busk may now own or hereafter acquire oil and gas leases in Croton township in the general area of said above described tract.

"Said purchase of crude oil shall be at the highest posted market price of oil of like grade and gravity in the area where same is produced or at the price fixed by any governmental agency."

The contract further provides:

"This agreement shall be binding upon the heirs, representatives, successors, or assigns of the parties hereto, but shall not be assigned by Busk without the written consent of Rex, and the terms of this agreement shall constitute a covenant running with the land and leasehold estates covered thereby."

During the drilling operations in section 20, Rex exercised its "call" on oil produced from the well in Weare township, Oceana county. The assignee of Rex is still taking oil from that well. The well on section 20 cost about $8,750, proved to be a dry hole on about January 3, 1950, and Rex then paid

Busk $1,000. Busk waived his right to an assignment of the Rex lease, and Rex, according to the testimony of its vice-president, let all its leases "drop" in the area of the dry hole.

In March of 1951, Busk acquired a lease on land in section 29, not specifically mentioned in the December, 1949, agreement. Before he began drilling on this property he assigned 7/16 of his lease to Carlie Grimes, and 1/8 to a contracting partnership, consisting of himself and one Ormiston. Busk retained for himself a 7/16 interest. He struck oil on June 23, 1951, and several days thereafter one Berger, a vice-president of Rex, asked Busk if he could buy this oil. He made no reference to the claimed option of Rex. Berger is also vice-president of the Naph-Sol Refining Company.

In late August of 1951 Busk began drilling another well in section 29 on lands specifically described in the Rex agreement. He had an undivided 1/2 interest in that lease at the time the Rex contract was made. He later acquired the entire lease, but claims that he had the same arrangement respecting this well with Grimes and the contracting partnership that he had on the other well. This last well also proved to be productive. Busk and his associates expended about $27,500 on the first producing well, and oil from it, and the last producing well was sold to Marvel Refining Company, which had advanced $10,000 in cash to Busk and had provided him with $15,800 worth of equipment.

On September 11, 1951, Rex advised Busk that it desired to exercise its "call" option, to which Busk replied the next day, denying the existence of the option, because of the termination of the 1949 agreement. A formal demand then followed for the delivery to Rex of oil produced under leases on property specifically mentioned and all other property under lease to Busk in the general area. Upon Busk's

refusal to sell the oil, Rex commenced an action for injunctive relief and for specific performance of its "call" agreement. A temporary injunction was dissolved upon the showing that its continuance would force a shut-down. It was stipulated that Busk could store his oil, or oil of like quantity and quality, pending the outcome of the litigation.

The record shows that by December 1, 1951, one of Busk's wells had produced 5,734 barrels of oil, the other had produced 3,248 barrels, and that these wells were still producing at the rate of about 66 barrels a day. The "posted" market price in the field was $2.80 per barrel, but Busk was receiving from Marvel $3, which included a 20-cent bonus. Busk claims that similar oil is available to anyone who is "able to compete on the open market." Rex claims that oil of the kind produced from wells involved here is not available on the open market and that the nearest source of similar oil is Oklahoma and Texas, where the market price is $2.61 to $2.65 per barrel. Pipeline space is unavailable from Oklahoma to the Muskegon, Michigan, market, and the rail transportation rate is $2.26 per barrel. The cost of transportation from Croton township to Muskegon is 31 cents per barrel. Busk was unwilling to venture an opinion as to the prospective commercial life of the producing wells, but thought it would be short.

Busk testified that the optional right of Rex to purchase oil from the Weare township well was still in force, because it was exercised during drilling operations on the dry hole. He said he assumed that other "calls" had terminated, because in other agreements similar options were always considered as being "washed out" in the event of a dry hole. He further said this was the custom in the industry. He stated that he had not forgotten about the provisions of the 1949 agreement when he made his

commitments to third parties regarding the subsequent wells.

At the close of the proofs the trial judge denied specific performance on the ground that the issuance of this discretionary writ was not justified in the light of the proofs, and also because of the fact that Rex had an adequate remedy at law if it could prove damages. The order entered on December 24, 1951, was "with prejudice as to the prayer for specific performance, but without prejudice to plaintiff's right to bring an action at law for damages."

Busk, in the trial below, did not rely upon abandonment by Rex or termination by mutual consent, but rather upon the claim that "this contract was intended by the parties to terminate in the event of a 'dry hole' and the plaintiff's conduct was evidence of such intention." Busk's testimony as to a custom among oil men, that contracts of this nature are terminated if the test well is a dry hole, is not corroborated. Such testimony is too indefinite and insufficient to permit us to read this claimed custom of the trade into the agreement. See *Boehme & Rauch Company* v. *Lorimer,* 221 Mich 372, 377.

The contract itself is silent as to its duration, and yet it cannot be presumed that the parties intended that Rex should have an indefinite and perpetual right to purchase oil produced on any property leased by Busk in the general area. Where an option agreement contains no provision as to its duration, rights thereunder must be exercised within a reasonable time, the extent of which must be determined in the light of the circumstances of the case.

All of the provisions of the Rex-Busk agreement, except the one covering the optional right to purchase oil, contemplate performance of both parties within unusually short periods of time. One provision even requires notification by phone or wire.

The testimony indicates that, because of the highly speculative nature of the industry, oil leases change hands very rapidly. It is axiomatic in oil field developments that it is too costly to hold on to a great number of leases for a long period of time. The indefinite term of the option clause in the agreement would effectually prevent the marketing and sale of the oil except on a day-to-day basis. It is undisputed that a contract such as the one here is usually of short duration. All the circumstances of the case indicate that the parties anticipated that the option rights would be exercised within a reasonable time after such wells became producers of oil.

The record, however, does not support the argument of plaintiff, that it is clearly entitled to the discretionary remedy of specific performance and that its remedy at law is inadequate.

Specific performance is a matter of grace and not of right. The granting of this remedy depends upon the peculiar circumstances of each case. *Marvin* v. *Solventol Chemical Products, Inc.,* 298 Mich 296, and authorities therein cited at page 299.

Plaintiff argues that specific performance may not be arbitrarily refused and that the court is controlled by settled equitable principles. We agree, but we do not find in this record any indication of an arbitrary refusal. On the contrary, we agree with the trial judge that the equities here will not justify the application of the remedy of specific performance, and that plaintiff's bill of complaint should be dismissed without prejudice to a proper action at law.

The decree is affirmed, with costs to appellee.

DETHMERS, C. J., and BUTZEL, CARR, SHARPE, BOYLES, and REID, JJ., concurred.

The late Justice NORTH took no part in this decision.